No. 99-220

IN THE SUPREME COURT OF THE STATE OF MONTANA

2000 MT 203

WAYNE KNUTSON,

Plaintiff, Counterclaim Defendant, and Respondent,

v.

BITTERROOT INTERNATIONAL SYSTEMS, INC.,

Defendant, Counterclaimant, and Appellant.

APPEAL FROM: District Court of the Fourth Judicial District,

In and for the County of Missoula,

The Honorable Ed. McLean, Judge presiding.

COUNSEL OF RECORD:

For Appellant:

Dan L. Spoon & Patrick J. McHugh, Reep, Spoon & Gordon, P.C.,

Missoula, Montana

For Respondent:

Bradley J. Luck, Garlington, Lohn & Robinson, PLLP, Missoula,

Montana

_____

Submitted on Briefs: August 19, 1999

Decided: July 20, 2000

Filed:

_____

Clerk

Justice Terry N. Trieweiler delivered the opinion of the Court.

1. ¶The Plaintiff, Wayne Knutson, filed this action in the District Court for the Fourth Judicial District in Missoula County to enforce the buy-out provision in his shareholders agreement with the Defendants, Bitterroot International Systems, Inc., and Stanley Spencer The District Court awarded summary judgment to Knutson. Bitterroot and Spencer appeal from the judgment of the District Court. We affirm the judgment of the District Court.

2. ¶The issues presented for review are:

3. ¶1. Did the District Court err when it concluded that the shareholders agreement was enforceable independent of the stock exchange between Bitterroot and Knutson?

4. ¶2. Did the District Court err when it concluded that there was sufficient consideration for the shareholders agreement?

5. ¶3. Did the District Court err when it dismissed the Defendant's affirmative defenses?

## FACTUAL BACKGROUND

1. ¶J. Stanley Spencer was the sole owner of Bitterroot, a trucking business located in Missoula, Montana. Wayne Knutson was the chief financial officer for Bitterroot. Spencer also owned a 51 percent interest in S.E.A. Trucking, Inc., another trucking business located in Missoula. Jhan Sorenson was a key employee at S.E.A. Robert Evers owned a 49 percent interest in S.E.A. When Robert died, his wife, Margaret Evers inherited his interest and agreed to sell her interest to Spencer for $29,119.

2. ¶On November 16, 1994, Spencer entered into a written contract with Knutson and Sorenson, in which Spencer assigned 51 percent of his interest in the stock he planned to purchase from Evers to Knutson for $14,856, and 31 percent to Sorenson for $8913. Spencer retained the remaining 18 percent interest in S.E.A. Following this transaction Spencer, Knutson, and Sorenson were the sole shareholders of S.E.A.

3. ¶Once Knutson and Sorenson became shareholders of S.E.A., the parties planned to have Bitterroot purchase all of the shares of S.E.A. by exchanging its stock for the S.E.A. stock. Bitterroot consulted KPMG Peat Marwick (KPMG), an accounting firm, regarding the potential tax consequences of the transaction. In a letter dated January 31, 1995, KPMG advised in part:

The proper reporting of the transaction for financial statement purposes as well as the appropriate tax treatment is dependent upon the fair market value of the various stock transfers. In brief, both financial reporting and income tax treatment would require the recognition of compensation expense by the corporation and the reporting of taxable income by Jan and you if the value of the BISI [Bitterroot] shares exceeds the value of the SEA shares which you are transferring to BISI. Assuming the value of the BISI shares received in exchange for your SEA shares are equivalent, the transaction should not result in gain or loss for financial statement purposes or income tax purposes to the corporation or to you as employees.

As you are aware, and consistent with our telephone conversation on this matter, the determination of the value of shares of a closely held corporation is an inherently factual matter involving application of judgment to the particular circumstances.

Although this letter was addressed to Knutson, it was reviewed by Spencer.

1. ¶On March 22, 1995, Bitterroot's board of directors held a special meeting to discuss Bitterroot's purchase of S.E.A. The minutes reflect the following:

[T]he three shareholders of S.E.A. TRUCKING, INC. had undertaken to value the shares of stock of S.E.A. TRUCKING, INC. and that the exchange is intended to be a transfer and exchange of equal value. A discussion was then had as to the valuation methodology and in particular the future prospects of business, the market for shares of S.E.A. stock, a discount applicable for minority shares of closely-held entities such as BITTERROOT INTERNATIONAL SYSTEMS, all of which considerations indicated that while the book values of the exchanged stock is not identical, the book value was not necessarily representative of the minority shares being acquired in BITTERROOT or S.E.A. Particular discussion was made of the minority shares being acquired in BITTERROOT INTERNATIONAL SYSTEMS, Wayne Knutson and Jhan Sorenson as well as the prospects for a value increase in S.E.A. which will be attributed to ownership by BITTERROOT.

Spencer agreed in his subsequent deposition that these minutes were accurate. After this discussion, Spencer transferred 625 shares of Bitterroot stock to Knutson in exchange for 262.5 shares of S.E.A. stock. Spencer also transferred 375 shares of Bitterroot stock to Sorenson in exchange for 157.5 shares of S.E.A. stock. Following this transaction, Spencer, Knutson, and Sorenson were the sole owners of Bitterroot: Spencer owned 92 percent; Knutson owned 5 percent; and Sorenson owned 3 percent.

1. ¶On May 1, 1995, Spencer, Knutson, and Sorenson executed a shareholders agreement. The purpose of the shareholders agreement was to define the control and management of Bitterroot; to create reciprocal rights and obligations; and to assure continuity of management upon a shareholder's death or termination of employment. The shareholders agreement established a right of first refusal for the corporation, and then for the shareholders in the event one of the parties wanted to sell his shares. The agreement also included buyout rights for the shareholders. It established a buyout formula and penalties for a shareholder's early exercise of his buyout rights.

2. ¶In January 1997 Knutson terminated his employment with Bitterroot and exercised his rights provided by the shareholders agreement. Bitterroot refused to pay Knutson in accordance with the shareholders agreement. Knutson brought this action to enforce the buy-out provision. After substantial discovery and motions for summary judgment by both parties, the District Court awarded summary judgment to Knutson.

## STANDARD OF REVIEW

1. ¶We review a summary judgment de novo, applying the same criteria applied by the District Court pursuant to Rule 56, M.R.Civ.P. *Mead v. M.S.B., Inc.* (1994), 264 Mont. 465, 470, 872 P.2d 782, 785. We determine whether there is an absence of genuine issues of material fact and whether the moving party is entitled to judgment as a matter of law. *Mead*, 264 Mont. at 470, 872 P.2d at 785.

## ISSUE 1

1. ¶Did the District Court err when it concluded that the shareholders agreement was enforceable independent of the stock exchange between Bitterroot and Knutson?

2. ¶In the interpretation of contracts we are guided by statutory law. *See* §§ 28-3-101, et. seq., MCA. "A contract must receive such an interpretation as will make it lawful, operative, definite, reasonable, and capable of being carried into effect if it

can be done without violating the intention of the parties." Section 28-3-201, MCA. A contract is interpreted to give effect to the mutual intent of the parties at the time it was made. Section 28-3-301, MCA. When a contract is written, the intention of the parties is determined by the writing alone, if possible. Section 28-3-303, MCA. "The language of a contract is to govern its interpretation if the language is clear and explicit and does not involve an absurdity." Section 28-3-401, MCA. In short, we determine the intentions of the parties by the words used in the contract.

3. ¶Section 28-3-203, MCA provides: "Several contracts relating to the same matters, between the same parties, and made as parts of substantially one transaction are to be taken together." *See also Hoerner Waldorf Corp. v. Bumstead-Woolford Co.* (1972), 158 Mont. 472, 481, 494 P.2d 293, 297-98; *Daines v. Knight* (1994), 269 Mont. 320, 327, 888 P.2d 904, 908. This rule does not apply to unambiguous contracts. 17A C.J.S. *Contracts* § 303.

The statement that contemporaneous instruments may be treated and interpreted as one means only that this will be done when it will effectuate the intention and if the provisions of the two instruments if put together will not be incompatible. The court may not do violence to a complete, unambiguous contract by consolidating it with another writing if the effect of doing so would be to avoid an essential part of the contract.

*Gerdes v. Omaha Home for Boys* (Neb. 1958), 89 N.W.2d 849, 856.

1. ¶In this case, Bitterroot contends that the "merger transaction" and the subsequent shareholders agreement should be read together as one contract. Relying on *Rumph v. Dale Edwards, Inc.* (1979), 183 Mont. 359, 600 P.2d 163, Bitterroot asserts that when construing one agreement that is part of a larger transaction, the intentions of the parties must be determined by examining the entirety of the larger transaction. Bitterroot, however, misapplies our holding in *Rumph*.

2. ¶Our decision in *Rumph* involved the interpretation of two contracts, a lease and a lease rider. We stated that the "primary question to be answered here is 'what do the terms of the contract provide?'" We then held that:

The intent of the parties to the contracts is determined by reading the lease agreement and lease rider in full. Appellant chooses to dissect the contracts, takes certain isolated words and phrases from them, and argues that these minute pieces express the true intention of the parties rather than an analysis of the contracts in full.

*Rumph*, 183 Mont. at 367, 600 P.2d at 167. The focus of the inquiry was on the intentions of the parties, as revealed by the words used in the related contracts. The issue in this case is not the same.

1. ¶The parties to this dispute were involved in three agreements, all of which occurred at different times and did not reference each other. They were: (1) a partial assignment to Knutson of Spencer's rights to purchase Margaret Evers interest in S. E.A.; (2) an exchange of Knutson's 625 shares in S.E.A. for 262.5 shares in Bitterroot; and (3) a shareholders agreement. Each of these agreements is clear and unambiguous. None, by its terms, depends on any other. The authorities relied on by Bitterroot do not permit courts to avoid the plain language of a complete, unambiguous contract by consolidating it with another writing if the effect of doing so would be to avoid an essential part of the contract. *See Gerdes*, 89 N.W.2d at 856. Therefore, we hold that the District Court did not err when it concluded that shareholders agreement was enforceable independent of the stock exchange between Bitterroot and Knutson.

## ISSUE 2

1. ¶Did the District Court err when it concluded that there was sufficient consideration for the shareholders agreement?
2. ¶A contract requires four elements: (1) identifiable parties capable of contracting; (2) their consent; (3) a lawful object; and (4) a sufficient cause or consideration. Section 28-2-102, MCA. Consideration is:

Any benefit conferred or agreed to be conferred upon the promisor by any other person, to which the promisor is not lawfully entitled, or any prejudice suffered or agreed to be suffered by such person, other than such as he is at the time of consent lawfully bound to suffer, as an inducement to the promisor is a good consideration for a promise.

Section 28-2-801, MCA.

1. ¶Bitterroot contends that the essential consideration for the shareholders agreement

was that the S.E.A. stock that was exchanged for Bitterroot stock was of equivalent value. This argument is based on the premise that the stock exchange and the shareholders agreement were one agreement. However, as we have held, the shareholders agreement is enforceable independent of the stock exchange.

2. ¶The purpose of the shareholders agreement was to promote the shareholder's interest and Bitterroot's interest by creating reciprocal rights and obligations among the shareholders. The creation of reciprocal rights and obligations is sufficient consideration to sustain the shareholders agreement. Therefore, we hold that the District Court did not err when it concluded that there was sufficient consideration for the shareholders agreement.

## ISSUE 3

1. ¶Did the District Court err when it dismissed the Defendant's affirmative defenses?

## A. Mistake of Fact

1. ¶A party may rescind a contract: "if the consent of the party rescinding or of any party jointly contracting with him was given by mistake . . . ." Section 28-2-1711(1), MCA. The rule regarding mistake of fact is:

A contract may properly be rescinded if the parties were laboring under a mutual mistake regarding a material fact at its inception. A mutual mistake occurs when, at the time the contract is made, the parties share a common misconception about a vital fact upon which they based their bargain. In order to justify rescission, the mutual mistake must be regarding a fact that is vital to the completion of the contract. Further, it must be so substantial and fundamental as to defeat the object of the parties in making the contract.

*South v. Transportation Ins. Co.* (1996), 275 Mont. 397, 401, 913 P.2d 233, 235 (citations omitted).

1. ¶Bitterroot contends that both Spencer and Knutson made a mistake in valuing S.E. A. stock. According to Bitterroot a stock exchange of equal value was "an assumption at the heart of this contract." Bitterroot suggests it is entitled to rescind the contract, because both Spencer and Knutson were mutually mistaken about the value of S.E.A. stock.

2. ¶A mutual mistake as to value is not necessarily sufficient to rescind a contract:

[T]he fact that both parties mistook the value of the subject matter of the contract, so that one sold more of a thing or a more valuable thing than he thought he was selling, and the other received more than he expected to receive, is, according to the weight of authority, immaterial to the case.

17A C.J.S. *Contracts* § 149. "Equity will not relieve a party of an improvident bargain simply because his opinion of its value proves incorrect." *Gardner v. Meiling* (Or. 1977), 572 P.2d 1012, 1017.

1. ¶Bitterroot bargained to exchange 625 shares of its stock for 262.5 shares of S.E.A. stock. The District Court could not rescind a validly formed contract because Bitterroot undervalued the S.E.A. stock. The law does not protect Bitterroot from improvident decisions regarding the value of stock. Therefore, we conclude that the District Court did not err when it dismissed the affirmative defense of mistake of fact.

## B. Equitable Estoppel

1. ¶In order to prove equitable estoppel, a party must establish six elements:

1. the existence of conduct, acts, language, or silence amounting to a representation or a concealment of a material fact;

2. these facts must be known to the party estopped at the time of his conduct, or at least the circumstances must be such that knowledge of them is necessarily imputed to him;

3. the truth concerning these facts must be unknown to the other party claiming the benefit of the estoppel at the time it was acted upon by him;

4. the conduct must be done with the intention, or at least the expectation, that it will be acted upon by the other party, or under circumstances both natural and probable that it will be so acted upon;

5. the conduct must be relied upon by the other party and, thus relying, he must be led to act upon it; and

6. he must in fact act upon it in such a manner as to change his position for the worse.

*Elk Park Ranch, Inc. v. Park County* (1997), 282 Mont. 154, 165, 935 P.2d 1131, 1137-38. If any one of these elements is not present, the right to equitable estoppel has not been established. *Elk Park Ranch, Inc.*, 282 Mont. at 166, 1131 P.2d at 1138.

1. ¶Bitterroot contends that Spencer relied on Knutson's stock valuation to his detriment. Bitterroot argues that Spencer was unaware of factors that Knutson failed to consider.
2. ¶Spencer may have been mistaken about the value of S.E.A. stock, but Spencer, the majority shareholder and president of both Bitterroot and S.E.A., was in a position to discover all the information necessary to value S.E.A. stock. Further, Spencer attended a meeting at which the valuation of S.E.A. stock was specifically discussed. On March 22, 1995, Bitterroot's board of directors held a special meeting to discuss the exchange of Bitterroot stock for S.E.A. stock. Both Spencer and Knutson were at the meeting. The minutes from that meeting reflect in part:

[T]he three shareholders of S.E.A. TRUCKING, INC. had undertaken to value the shares of stock of S.E.A. TRUCKING, INC. and that the exchange is intended to be a transfer and exchange of equal value. A discussion was then had as to the valuation methodology and in particular the future prospects of business, the market for shares of S.E.A. stock, a discount applicable for minority shares of closely-held entities such as BITTERROOT INTERNATIONAL SYSTEMS.

Spencer agreed in his deposition that these minutes were accurate. Spencer participated in valuing the companies' stock. The truth regarding the value of the stock was as discoverable to Spencer as it was to anyone else. Therefore, we hold that the District Court did not err when it dismissed Bitterroot's equitable estoppel defense.

## C. Negligent Misrepresentation

1. ¶In *State Bank of Townsend v. Maryann's, Inc.* (1983), 204 Mont. 21, 33, 664 P.2d 295, 301, we approved the definition of negligent misrepresentation as contained in Restatement (Second) of Torts § 552:

(1) One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

*See also Durbin v. Ross* (1996), 276 Mont. 463, 472, 916 P.2d 758, 764. This definition requires that the party asserting negligent misrepresentation was justified in relying on the allegedly false information.

1. ¶In this case, the District Court concluded that as the "sole shareholder of both companies Mr. Spencer knew the respective values of his companies and the companies' stocks, and his assertion that he was misled by Knutson in that regard are neither credible, nor factually supportable, on the record." The District Court's conclusion that Spencer did not rely on Knutson is supported by the following testimony given by Spencer:

Q. You hired, I believe, Galusha, Higgins and Galusha to be your tax accountants; is that correct?

A. Yes.

Q. You also hired Peat Marwick as an accounting firm; is that correct?

A. Yes.

Q. And the reason you did that was that you weren't relying on Mr. Knutson to be the definitive word in accounting or tax matters, but sought outside consultation; is that correct?

A. Galusha was engaged before Mr. Knutson was hired. As any prudent business would do, outside counsel is just good business to not be relying on the inside personnel.

Q. And that's why you hired a good lawyer and a good accountant.

A. Yes.

Further, Spencer knew that the book values were disparate at the time of the transaction. He testified:

Q. Tell me why you believe there wasn't equivalent value in the issuance of the Bitterroot shares.

A. The book values of the two companies were completely disparate.

Q. Okay. Which is something you knew at the time of the transaction.

A. Yes.

We conclude that the District Court did not err when it dismissed Bitterroot's claim of negligent misrepresentation.

### D. Breach of Fiduciary Duty

1. ¶Bitterroot contends that "Mr. Knutson was in a fiduciary position which required him to exercise extra care to be objective, neutral and thorough in carrying out his valuation of stock." Bitterroot cites no authority for this legal standard, and provides no analysis of how it was breached by Knutson.
2. ¶The correct legal standard, is set forth in § 35-1-443, MCA:

(1) An officer with discretionary authority shall discharge his duties under that authority:

(a) in good faith;

(b) with the care an ordinarily prudent person in a similar position would exercise under similar circumstances; and

(c) in a manner the officer reasonably believes to be in the best interests of the corporation.

Further, so long as an officer meets the provisions of this statute, the officer will not be held liable for errors in judgment. *See* 18B Am. Jur. 2d *Corporations* § 1705.

1. ¶In its brief, Bitterroot contends that Knutson's valuation of the stock was inaccurate

and, therefore, Knutson breached his duty as an officer. However, valuation of stock in a closely-held corporation is inherently subjective. "One of the most difficult challenges in corporate accounting involves the determination of the value of stock for which there is little or no public market." 18A Am. Jur. 2d *Corporations* § 451. Bitterroot does not contend that Knutson acted in bad faith; it simply suggests that he was wrong. Bitterroot states: "[T]he facts clearly support a finding that the parties were mistaken about stock values at the time of the merger transaction." Further, Patrick Frank, the attorney hired by Bitterroot to draft the transaction documents, gave the following testimony at his deposition:

Q. Based on your [Frank's] involvement with this transaction from beginning to end, are your aware of any obligation that Wayne Knutson had to Bitterroot or to Stan Spencer that he breached?

A. No.

Patrick Hanley, a tax and accounting consultant hired by Bitterroot, stated in his deposition: "I am not aware of Wayne Knutson having breached any obligation." Therefore, we conclude that the District Court did not err when it dismissed Bitterroot's claim that Knutson breached his fiduciary obligation to Spencer.

1. ¶We affirm the judgment of the District Court.

/S/ TERRY N. TRIEWEILER

We Concur:

/S/ WILLIAM E. HUNT, SR.

/S/ KARLA M. GRAY

/S/ JIM REGNIER

/S/ W. WILLIAM LEAPHART