FILED

12/20/2022

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 22-0197

DA 22-0197

# IN THE SUPREME COURT OF THE STATE OF MONTANA

## 2022 MT 246

MICHAEL J. O'BRIEN and LINDA S. O'BRIEN,

> Plaintiffs and Appellants,

v.

RAYMOND O'BRIEN, ERIN BRENTESON,
RANDY BRENTESON and J.C. O'BRIEN
& SONS, INC., a Montana corporation,

> Defendants and Appellees.

APPEAL FROM:     District Court of the Ninth Judicial District,
In and For the County of Pondera, Cause No. DV-37-2017
Honorable Jon A. Oldenburg, Presiding Judge

COUNSEL OF RECORD:

> For Appellants:

> Brian D. Lee, Caydon C. Keller, Lee Law Office PC, Shelby, Montana

> Thane Johnson, Johnson, Berg & Saxby, PLLP, Kalispell, Montana

> For Appellees:

> Kirk D. Evenson, Marra, Evenson & Levine, PC, Great Falls, Montana
> (for Raymond O'Brien, Erin Brenteson & Randy Brenteson)

> Gary W. Bjelland, Heather M. Starnes , Jardine Stephenson Blewett &
> Weaver, PC, Great Falls, Montana (for J.C. O'Brien & Sons, Inc.)

> Submitted on Briefs:  October 5, 2022

> Decided:  December 20, 2022

Filed:

_____
Clerk

Justice Jim Rice delivered the Opinion of the Court.

¶1    Plaintiffs Michael J. O'Brien (Mike) and Linda S. O'Brien appeal the Judgment entered upon Findings of Fact, Conclusions of Law and Order after a bench trial by the Ninth Judicial District Court, holding, inter alia, that Defendant J.C. O'Brien & Sons, Inc. (JCO or Corporation) was entitled to purchase Mike's shares in JCO at the value set pursuant to the 1973 Shareholder Agreement. We address the following issue, and affirm:

¶2    *Did the District Court err by holding JCO was entitled to purchase Mike's JCO shares at the value set by the directors pursuant to the 1973 Shareholder Agreement?*

## FACTUAL AND PROCEDURAL BACKGROUND

¶3    JCO is a closely held Montana corporation operating a 2,400-acre dryland farming operation and a 452-acre gravel pit. JCO has been held by the O'Brien family for several generations, with Buck O'Brien (Buck), now deceased, having purchased it from his parents around 1973. Buck's children, including Mike, and Defendants/Appellees Raymond O'Brien and Erin Brenteson, are the current shareholders of JCO.[1]

¶4    From 1995 to May of 2001, Buck, Mike, Raymond, and Erin owned JCO and operated as both shareholders and officers and/or directors of the company. During that time, each of the children owned 287.66 shares of stock in JCO, while Buck owned 919 shares along with a life estate that gave him voting rights in 302 additional shares.

---

[1] Mike's wife, Linda O'Brien, and Erin's husband, Randy Brenteson, are the other parties in the action, but are not shareholders of JCO.

¶5     In May of 2001, JCO reorganized and created a corporate spinoff by which Mike acquired 540 acres of farmland and $70,000 in debt forgiveness from JCO. In exchange, Mike transferred all of his shares in JCO as well as his remainder interest in JCO shares under a life estate from Buck. Mike resigned as officer and director, and became unaffiliated with JCO for a period of 13 years.[2]

¶6     In 2014, his health failing, Buck gifted 249 shares of JCO each to Mike, Raymond, and Erin, which made Mike a JCO shareholder again. Buck died shortly thereafter, leaving 172 shares in his estate. Most of these shares were applied to satisfy a personal loan Buck had taken from JCO, and the remaining 10 shares were divided equally among the three siblings. Mike then owned 252.33 shares, and Raymond and Erin owned 540 shares each.

¶7     Earlier, in 1973, JCO and the shareholders, including Buck and the three children,[3] entered a written agreement, entitled Buy and Sell Agreement (1973 Agreement), which established provisions for the sale and purchase of corporate stock. Paragraph 1 provided that, upon the death of any stockholder, the JCO Corporation had the option to purchase the decedent's stock. Paragraph 2 provided that the "purchase price of each share of stock of the Corporation shall be its *book value* of said stock," unless a "*valuation* has been placed on said stock" by the Board of Directors at an annual meeting (emphasis added).

---

[2] The District Court found from trial testimony that the spinoff was effectuated because of tension between Buck and Mike, and that Buck intended provisions of the 1973 shareholder agreement to protect JCO from issues arising from Mike's ownership of shares. Mike argues on appeal that the District Court erroneously relied upon extrinsic evidence in citing this testimony.

[3] The 1973 and 1978 shareholder agreements included Buck's wife, Anna Mae O'Brien, but she is now deceased and was not a shareholder at the time of the present dispute.

Paragraph 5 provided an option to the JCO Corporation to initiate purchase of "the stock of any shareholder in all or any amount" upon 30 days' notice (herein, "Corporate Option"), with the purchase price for such purchase likewise determined in accordance with Paragraph 2. Paragraph 5 provided that, in the event a minority stockholder wished to sell his stock to an outside party, he was required to notify the Corporation, which would have the option to purchase his shares, again at the purchase price determined in Paragraph 2.

¶8    In 1978, JCO and the shareholders entered into another written agreement, also entitled Buy and Sell Agreement (1978 Agreement). The 1978 Agreement contained several whereas clauses expressing a desire "to prevent the stock of any of [the stockholders] passing into the hands of third persons," but made no reference whatsoever to the 1973 Agreement. Paragraph 2 provided the procedure for the disposal of stock upon the death of a shareholder and stated that, upon such death, the Corporation had the option of acquiring all of the decedent's stock. Paragraph 3 provided that the purchase price for each share of stock was "the *amount approved* at the stockholders' and directors' meeting," with the further proviso that, "in the event more than five (5) years have lapsed from the date in which the last valuation has been set," then the share value "will be determined by a *current appraisal*" of the JCO Corporation (emphasis added). Paragraph 5 of the 1978 Agreement provided that, in the event "any STOCKHOLDER . . . desires to dispose of his stock," he must first offer the stock to the Corporation, which could purchase the stock at the price determined in Paragraph 3 (capitalization in original).

4

¶9     Thus, there are three methods of stock valuation, highlighted above, referenced in the 1973 and 1978 Agreements for the purpose of stock purchases: the Corporation's book value (1973 Agreement), a value designated by the Corporation (1973 and 1978 Agreements), and a value determined by appraisal (1978 Agreement). The method properly employed is dependent upon the conditions and circumstances described in the Agreements, and the interpretation of the Agreements, which is the subject of this appeal.

¶10    Following Buck's death, significant disputes arose among the sibling-shareholders, primarily from Mike's objections to the operation of JCO and his status as a minority shareholder who could not alone prevail on votes taken by the shareholders. In February 2016, the Appellee siblings directed their attorney, Gary W. Bjelland, to write a letter to Mike demanding buy-back of the JCO shares of stock owned by Mike. The letter stated that, "[i]n accordance with Section 5 of the Buy and Sell Agreement among the corporation and the shareholders . . . the corporation is exercising its option to acquire the 249 shares of stock held by you." The agreement referenced by the letter was the 1973 Agreement, and the price offered was the corporate book value of the shares, or about $451.13 per share. Mike refused to sell his shares. At the March 2017 annual meeting, the directors designated a share value of $761.87 per share, an action that increased the purchase value of Mike's shares by $64,155.30, to $192,242.66. Mike also refused to sell at this price.

¶11    Plaintiffs initiated this litigation in November of 2017, making various claims and seeking various forms of relief, most of which are not before the Court in this appeal, but including minority shareholder oppression, breach of duties by the directors, breach of duties by the officers, conversion of well, prescriptive easement, and conversion of other

property. Pertinent here, Plaintiffs also alleged the Defendants had breached the 1978 Agreement in its efforts to purchase Mike's shares, and sought valuation of his shares by current appraisal. The District Court tried several of these claims in a bench trial, ruling against the Plaintiffs. On the issue of share purchase, the District Court noted that the 1973 Agreement had provided the Corporate Option to purchase stockholders' shares, which was not altered or mentioned by the 1978 Agreement. The District Court cited extrinsic evidence to support its finding that Buck's intention and understanding was that the 1973 Agreement had not been replaced by the 1978 Agreement. The District Court concluded there had been no merger or novation of the agreements, reasoning that:

> By never mentioning an elimination of the 1973 [Corporate Option], there could be no extinguishment of that obligation on the shareholders, merely by the fact that the 1978 Agreement was signed by the shareholders. This is because a novation must be made by a clear and definite intention by all the shareholders of JCO and can never be presumed.

The District Court thus ordered that JCO was entitled to purchase Mike's shares at the value designated by the Corporation in 2017, or $761.87 per share.[4]

¶12 Plaintiffs appeal, challenging only the District Court's holding regarding the valuation of Mike's shares.

---

[4] At one point in its conclusions, the District Court stated that Mike "would only be entitled to have the *book value* determined and used to determine" the value of his shares (emphasis added). The "book value," the first of the three valuation methods under the Agreements, was cited in the 2016 letter to Mike from JCO's counsel, which set the value at about $451.13 per share. It appears this particular statement by the District Court was made in error, because the court proceeded to hold, including in its Order and subsequent Judgment, that Mike was entitled to the price of $761.87 per share as designated by the directors in 2017, the second valuation method under the Agreements. Neither party explicitly argues the District Court held, or that Mike was limited to, this book value of the shares, although Appellants sometimes refer to "book value" in their arguments to contrast their request for "market value."

**STANDARD OF REVIEW**

¶13     On appeal from a bench trial, we review a district court's findings of fact under a clearly erroneous standard of review. *Dern v. Dern (In re Estate of Dern Family Trust)*, 279 Mont. 138, 144, 928 P.2d 123 (1996); *see also Kurtzenacker v. Davis Surveying, Inc.*, 2012 MT 105, ¶ 14, 365 Mont. 71, 278 P.3d 1002. A finding of fact is clearly erroneous if not supported by substantial evidence, if the district court has misapprehended the effect of evidence, or if a review of the record leaves the Court with the definite and firm conviction that a mistake has been committed. *Dern*, at 144. We review a district court's conclusions of law *de novo* to determine if the court's interpretation of the law is correct. *Dern*, at 144.

**DISCUSSION**

¶14     *Did the District Court err by holding JCO was entitled to purchase Mike's JCO shares at the value set by the directors pursuant to the 1973 Shareholder Agreement?*

¶15     Appellants contend the District Court erred by requiring Mike to sell his JCO shares back to the Corporation at the per-share value designated by the directors in February 2017, and that he is entitled to sell them back at market value based upon an appraisal pursuant to the 1978 Agreement. Citing contract principles, Appellants contend the 1978 Agreement was a novation, modification or substitution of the 1973 Agreement, and that the District Court "ignored [these] major pillars of contract law and erroneously deferred instead to consideration of parol or extrinsic evidence, to the exclusion of the plain unambiguous language of the 1978 Agreement." Finally, Appellants argue Paragraph 5 of the 1978 Agreement contains the only controlling stock buy-back provision, under which

7

Mike is entitled to market value for his shares and, alternatively, even if the 1973 Agreement survived, Mike is entitled to market value under "some form of equitable consideration."

¶16    It may be helpful to further explain the legal hurdles Appellants must clear under their theory to establish reversible error and prevail on their market value claim. First, they must establish that the 1973 Agreement, with its textual Corporate Option, is no longer valid, but was substituted entirely by the 1978 Agreement. Appellants must further establish that a corporate-initiated purchase of a stockholder's shares is governed by Paragraph 5 of the 1978 Agreement, despite its language describing only a stockholder-initiated sale of stock. Then, Appellants must establish that under Paragraph 3, the purchase price provision of the 1978 Agreement, Mike was not subject to the directors' March 2017 designation of share value, but was instead entitled to the exception that provides for a market appraisal if "more than 5 years have lapsed from the date of the last [director] valuation." Using another metaphor, Appellants must "run the table" on these issues to obtain a market valuation under the Agreements.

¶17    Taking the last part first, Appellants argue that, while Mike initiated this litigation in November 2017 because of Appellees' refusal to pay market value for his shares—just eight months after the directors designated the share value to be $761.87—the five-year period without a further value designation necessary to trigger the market appraisal exception in Paragraph 3 has lapsed by *now*. However, the lapsing of the five-year period during the litigation cannot serve to establish a breach of the Agreement, when the case was litigated through a trial, prior to lapse of the period. For that reason, Appellants must

8

fall back on a generic equitable argument, but we concur with the District Court's reasoning that "[i]t would be inequitable to allow Mike to file this suit, hope it extends beyond the five years and then obtain a different value," not to mention constitute a clear departure from the Agreement.[5]

¶18 We address Appellants' other issues briefly. Notably, while the District Court cited extrinsic evidence to assist in construing the Agreements, and a significant part of Appellants' argument is directed to that concern, we conclude the use of extrinsic evidence is not necessary for resolution of the appeal.

¶19 Appellants cite the contract standards requiring unambiguous agreements to be applied as written, according to their terms, and we agree. *See Morning Star Enters. v. R.H. Grover, Inc.*, 247 Mont. 105, 111, 805 P.2d 553, 555-56 (1991) ("When the language of a contract is clear and unambiguous, the contract does not require the application of the rules of construction and it is the court's duty to enforce the contract as made by the parties."). Then, Appellants rely upon *Kester v. Nelson*, 92 Mont. 69, 10 P.2d 379 (1932), for its holding regarding a subsequent agreement, that if the "terms of the latter [agreement] are so inconsistent with those of the former that they cannot stand together, the latter may be construed to discharge the former." *Kester,* 92 Mont. at 74, 10 P.2d at 380. Appellants

---

[5] Upon the assumption the appraisal pricing exception in Paragraph 3 of the 1978 Agreement is foreclosed, Appellees argue Appellants' arguments fail because, under either Paragraph 2 of the 1973 Agreement, or Paragraph 3 of the 1978 Agreement, the value for Mike's shares would be the same—the amount designated by the directors in March 2017, or $761.87. However, this assumes that Paragraph 3 of the 1978 Agreement is applicable to corporate-initiated purchases of JCO stock from shareholders. While we do not decide here if that provision would apply to a corporate-initiated stock purchase in the absence of the 1973 Agreement, we simply note that such an application appears inconsistent with its language.

argue the 1978 Agreement's terms "unambiguously alter[ed] contractual terms previously agreed by the same parties" and thus, "the subsequent agreement controls."

¶20　However, we conclude the 1978 Agreement did not unambiguously alter the 1973 Agreement in regard to the issue here—a corporate-initiated purchase of shareholder stock.[6] Only the 1973 Agreement contained a provision addressing such a purchase, the Corporate Option. Despite Appellants' argument that Paragraph 5 of the 1978 Agreement was broad enough to include a corporate-initiated purchase, the language of that provision speaks only to sales initiated by stockholders. Thus, unlike the 1973 Agreement, the 1978 Agreement did not explicitly address corporate-initiated stock purchases and, further, did not reference the 1973 Agreement at all.

¶21　In *Knutson v. Bitterroot Int'l Sys., Inc.*, 2000 MT 203, 300 Mont. 511, 5 P.3d 554 we noted the statute providing that "[s]everal contracts relating to the same matters, between the same parties, and made as parts of substantially one transaction are to be taken together." *Knutson*, ¶ 15 (citing § 28-3-203, MCA). Even assuming *arguendo* this statute would apply to the subject Agreements as "parts of substantially one transaction," we further explained in *Knutson* that this provision "does not apply to unambiguous contracts." *Knutson*, ¶ 15 ("The court may not do violence to a complete, unambiguous contract by consolidating it with another writing if the effect of doing so would be to avoid an essential part of the contract.") (citation omitted). The three contracts at issue in *Knutson* "occurred

---

[6] Appellants do not contest the District Court's finding that JCO initiated the subject stock purchase transaction, stating in their brief that "the Appellee siblings in February 2016 [] demanded Mike sell his shares to them. . . ."

at different times and did not reference each other" and, each of the "agreements [was] clear and unambiguous." *Knutson*, ¶ 18. We conclude a similar situation exists here. The 1973 Agreement and the 1978 Agreement are separate from one another and complete on their own. Consolidating the two Agreements into one—the 1978 Agreement—would void an essential and exclusive provision of the 1973 Agreement, the Corporate Option.

¶22 Appellants argue the 1978 Agreement constituted a novation. A novation occurs when parties intend to substitute a new obligation for an existing one. Section 28-1-1502, MCA, provides that:

> Novation is made by the substitution of:
>     (1) a new obligation between the same parties with *intent to extinguish* the old obligation;
>     (2) a new debtor in place of the old one with *intent to release* the latter; or
>     (3) a new creditor in place of the old one with *intent to transfer* the rights of the latter to the former.

(Emphasis added.) As the District Court noted, we have held that novation cannot be presumed:

> *In order to effect a novation there must be a clear and definite intention on the part of all concerned* that such is the purpose of the agreement, for it is a well-settled principle that novation is never to be presumed . . . *the point in every case, then, is did the parties intend by their arrangement to extinguish the old debt or obligation and rely entirely on the new*, or did they intend to keep the old alive and merely accept the new as further security, and this question of intention must be decided from all circumstances.

*Waite v. Andreassi*, 249 Mont. 149, 151, 813 P.2d 987, 989 (1991) (quoting *Harrison et al. v. Fregger et al.*, 88 Mont. 448, 454, 294 P.372, 373 (1930)) (emphasis added). As we consider the record of the circumstances here, there is simply nothing to indicate an intention to "extinguish" the 1973 Agreement and "rely entirely" on the 1978 Agreement,

11

beyond the mere fact the 1978 Agreement was entered. That alone is insufficient to establish a "clear and definite intention on the part of all concerned" that the purpose of the 1978 Agreement was to extinguish the 1973 Agreement. *Waite*, at 151. *See also* 30 S. Williston on Contracts § 76:12 (4th ed. 2022) ("Thus, a situation can arise where there are two contracts and the second contract will operate as a novation of the first contract; but this will occur only when the parties to both contracts intend and agree that the obligations of the second will be substituted for and operate as a discharge of the obligations of the first."). We again note that no reference to the 1973 Agreement was made within the 1978 Agreement. Under these governing principles, Appellants did not meet their burden of establishing novation.

¶23 We conclude the District Court did not err by holding that JCO was entitled to purchase Mike's JCO shares for the price designated by directors in 2017, pursuant to Paragraph 2 of the 1973 Agreement.

¶24 Affirmed.

/S/ JIM RICE

We concur:

/S/ JAMES JEREMIAH SHEA
/S/ BETH BAKER
/S/ INGRID GUSTAFSON
/S/ DIRK M. SANDEFUR