249 P.3d 1070 (2011)
Michael COOK, Appellant,
v.
Rebecca COOK, Appellee.
No. S-13550.
Supreme Court of Alaska.
April 22, 2011.
*1073 Jason A. Weiner, Hall & Weiner, Fairbanks, for Appellant.
No appearance by Appellee.
Before: CARPENETI, Chief Justice, FABE, WINFREE, CHRISTEN, and STOWERS, Justices.

OPINION
FABE, Justice.

I. INTRODUCTION
During their divorce proceedings in May 2002, Michael Cook and Rebecca Cook (n/k/a Rebecca Hamsley) divided stock in two corporations by entering into a partial settlement agreement (Agreement). They agreed that Rebecca would give her share of the stock to Michael and that Michael would pay Rebecca for the stock over time according to the terms of the Agreement. Michael fell behind on his payments, and in October 2008 Rebecca requested that the remaining amount under the Agreement be reduced to judgment. Michael did not object to paying certain delinquent amounts, but argued that he should not have to pay anything more because additional payments were contingent on the corporations' profitability. Michael also asserted that the Agreement should be fully or partially dissolved or that the court should relieve him from having to make future payments.
Although the superior court agreed that some payments under the Agreement were dependent on the corporations' profitability, it determined that Michael and Rebecca had not intended a $2,000 per month payment to be contingent on profitability. The superior court thus found that Michael was responsible for the $2,000 per month payment even though the corporations had not been profitable. The trial court also rejected Michael's contract defenses and declined to relieve him of his obligations under the Agreement. Michael was ordered to pay $47,132.46 plus continuing interest, the amount owing under the Agreement as of January 31, 2009. Michael appeals the superior court's decision.[1] Because we agree with the superior court's interpretation that the $2,000 per month payment *1074 did not depend on the subject corporations being profitable and conclude that the superior court did not err in declining to relieve Michael in whole or in part from his obligations under the Agreement, we affirm the superior court's judgment.

II. FACTS AND PROCEEDINGS
Michael and Rebecca Cook married in 1975 and divorced in May 2002. Their primary marital assets were two corporations, Polar Environmental Technologies, Inc. and Springline Mining and Exploration, Inc. At the time of their separation, Michael and Rebecca owned 255,000 shares of Polar stock and 55,000 shares Springline stock.

A. The Divorce Trial And First Agreement
On January 7 and 8, 2002, Superior Court Judge Mary E. Greene presided over the parties' divorce trial. At trial, Michael's and Rebecca's attorneys announced that the parties had come to an agreement for dividing the corporate stock and orally conveyed the terms of the agreement to Judge Greene. Broadly, the parties agreed that Michael would get all of the stock and would pay Rebecca for her interest in the corporations. The value of Rebecca's share of the stocks was initially assessed at $750,000 and made payable under a 20-year note.
Rebecca's counsel detailed at trial that Michael would pay $1,000 per month for five years, with payments going first to child support and then toward paying the $750,000 debt. After five years, the remaining principal would begin to bear eight percent per annum interest. Also at five years, Michael's monthly payments would increase to $2,000 to be applied toward the remaining principal and accrued interest on the 20-year note. Rebecca's counsel stated that Michael would have to pay the $2,000 per month "regardless of what his income is and regardless from what source."[2] In addition, the parties agreed that if Michael made more than $40,000 per year from the corporations he would pay half of any amount over that $40,000 toward any remaining debt. Michael's counsel stated that his main concern was that Michael would not "have to go out and get three jobs and try to pay off these [$6,000] or $7,000 a month payments." Judge Greene asked if Michael and Rebecca agreed with the terms of the oral agreement; both stated that they did and on January 22, 2002, Judge Greene wrote that the parties had "reached an agreement announced in court on those two assets."

B. The First Agreement Is Reduced To Writing And Disputed.
On March 15, 2002, Rebecca filed a proposed agreement that attempted to reduce the in-court oral agreement to writing. The proposed agreement first stated that Michael would pay Rebecca $1,000 per month for five years, applied first to child support and then to "the $750,000 discussed below." It then described that after five years any remaining principal would bear eight percent interest, and "Michael's monthly payments shall increase to $2,000, which shall be applied first to interest and then to principal." The draft added that if Michael's "after tax income (salary, wages, bonuses, and dividends) from the two corporations exceeded $40,000 a year, half of the excess" was to be paid toward the debt. The proposed agreement dictated that Michael would pay Rebecca $2,000 per month and half of the excess over $40,000 income from the corporations until the entire debt, plus interest, was paid off.
Michael disputed Rebecca's proposed draft and filed a motion to correct the settlement terms. Michael's primary contention was that his monthly payments should end after 20 years, even if the debt had not been paid off. He reasoned that if the debt had not been satisfied after 20 years, it would be unfair for him to have to continue to pay Rebecca because an outstanding balance would "prove[ ] that the corporations either failed completely or were not worth enough to warrant paying Rebecca $750,000 for half interest in the parties' shares in them."
*1075 Rebecca responded that she never intended to forgive any remaining principal after 20 years and that in fact according to the payment plan the $750,000 note would not necessarily be paid off during that time.[3] She repeated that Michael had to pay $2,000 per month plus half of his corporate income over $40,000 until the note was paid off.
After this dispute, on April 19, 2002, the superior court concluded that the parties had not reached a settlement "despite their assertions to the contrary" and reopened the proceedings to divide the marital estate and decide the disposition of the corporations.

C. The Revised Agreement
On May 9, 2002, the divorce trial resumed. Michael and Rebecca told Judge Greene they had settled the division of the stock and they filed a written, signed Partial Settlement Agreement ("Agreement"). The superior court entered the final divorce decree and the Agreement that day.
In relevant part, the Agreement states:
1. The 255,000 marital shares of Polar Environmental Technologies, Inc. stock[ ] and the 55,000 marital shares of Springline Mining and Exploration, Inc. stock[ ], shall go to Michael. Rebecca shall execute any documents necessary to effect that.
2. Michael shall pay Rebecca the following:
a. $1,000/month commencing on June 1, 2002, and on the first of each month through May 1, 2007 (five years); the $1,000/month shall be applied first to child support (arrearage and current), and after all child support has been paid, the $1,000/month shall be applied to the $675,000 discussed below. Payment of the $60,000 (60 months at $1,000/month) is unconditional, i.e. Michael shall make these payments regardless of the success or failure of the subject corporations.
b. After five years, a principal figure of $675,000 less any principal payments applied after child support shall bear 8% per annum interest and be amortized for the next 15 years. On May 1, 2007, Michael's monthly payments shall increase to $2,000, which shall be applied first to interest and then to principal. Should Michael's after tax income (salary, wages, bonuses, and dividends) from the two corporations exceed $40,000 a year, half of the excess shall be paid to Rebecca and applied first to interest and then to the principal. By January 31st of each year, Michael shall give Rebecca copies of W-2's, K-1's and 1099's from these two corporations. If at the end of the 15-year period, interest and principal are still owing, the principal shall continue to bear 8 % per annum interest, and the above described payments of half of the excess over $40,000 income from the corporations shall continue to be made by Michael to Rebecca until all the principal and interest has been paid. At the expiration of the 15 year period, the $2,000/month payments shall cease.
The terms of the Agreement were different from the terms announced during the divorce trial in January 2002, and from those submitted by Rebecca in March. Most notably, the principal value of Rebecca's portion of the stock was reduced from $750,000 to $675,000 and the term of the $2,000 per month payments was expressly limited to 15 years.

D. The Current Proceedings To Enforce The Agreement
In October 2008, six years after the parties entered into the Agreement, Rebecca moved to reduce the amount owed under the Agreement to judgment. Rebecca alleged that Michael had made no payment for two years, had made only 16 of the next 54 payments due under the Agreement, all of them late, and had not made any payments since May 2007.
Michael opposed Rebecca's motion and asked the superior court to excuse all or part of his obligations under the Agreement, or at least limit his obligation to the $60,000 owed under paragraph 2.a. He first argued that the Agreement should be dissolved in its *1076 entirety because Rebecca's conduct toward investors constituted interference with Michael's business and violated the covenant of good faith and fair dealing, and because Michael entered the agreement under duress. Alternatively, Michael asserted that the Agreement should be interpreted such that payments under paragraph 2.b ($2,000 per month plus half of any of Michael's income from the corporations in excess of $40,000) were contingent on the profitability of the corporations so that "[i]f the income from the subject corporations does not allow payment of the $2,000/month ... the $2,000/month need not be paid." He also suggested that the Agreement should be reformed because the parties made a mutual mistake of fact in overvaluing the corporations. Finally, Michael asked the court to relieve him from future obligations under the Agreement pursuant to Alaska Civil Rule 60(b). Rebecca objected to each of Michael's "contract affirmative defenses" and argued that Michael should not be relieved of his obligations under the Agreement.
The superior court held a series of hearings from December 2008 to February 2009. The court initially noted that there was ambiguity in the Agreement regarding Michael's obligations under paragraph 2.b and requested testimony regarding "what the parties reasonably believed were the terms of the agreement at the time that they entered into it."
Rebecca's divorce counsel testified on February 20, 2009.[4] He stated that the $2,000 per month payment in paragraph 2.b of the Agreement was "not contingent on any notion of profitability or profits of the corporation" and had to be paid "by whatever means Mr. Cook had." Rebecca's testimony confirmed that she also understood that payments under paragraph 2.b did not depend on the corporations' profitability.
Michael's divorce counsel then presented his interpretationthat if the corporations didn't earn Michael an income of more than $40,000, Michael would not have to make any payments under paragraph 2.b of the Agreement. He alleged that all payments in paragraph 2.b were conditioned on whether the corporations earned Michael over $40,000 per year. Michael then testified that he understood that once his salary from the corporations reached $40,000 per year he would have to pay $2,000 per month.
On March 10, 2009, the superior court found that Rebecca was entitled to reduce Michael's delinquent payments under paragraph 2.a of the Agreement to judgment. The superior court entered a judgment against Michael for $13,359.16, the amount owed for arrearage and interest up to May 1, 2007.[5]
On May 15, 2009, the superior court issued a memorandum decision and order resolving the remaining issues. The superior court explained that it had sought to "determin[e] the parties' reasonable expectations at the time of contract [in 2002]." After reviewing the structure of the Agreement, the negotiations between the parties, and the testimony presented at the hearing, the superior court found that under paragraph 2.b of the Agreement payments of income over $40,000 per year were contingent on corporate profitability (i.e., earning Michael an income exceeding $40,000 per year) but that the $2,000 per month payment was not. The superior court explained:
It appears more likely that the parties intended on requiring the $2,000/month during the existence of the corporations during the formative years, and would not increase that amount until the corporations got to the point of earning Michael more than a reasonable base salary (i.e.$40,000).... [Michael] is incorrect that `success or failure' was intended by the parties to mean the corporation[s] [were] earning him a profit as applied to the $2,000/month payments.
*1077 The superior court concluded that "the intent of the parties at the time of the Agreement" was that Michael would have to pay Rebecca only $2,000 per month "while the corporations were developing" and would not have to pay additional amounts under paragraph 2.b "unless and until [the corporations] became profitable enough that Michael began earning more than $40,000/year from them." Thus, the court held that Michael was responsible for the $2,000 per month payments from May 1, 2007 onward but not obligated to pay more than $2,000 per month (except for late fees and interest) "until the corporations earn him more than $40,000/year."
On June 15, 2009, the trial court entered judgment against Michael in the amount of $47,132.46, plus the Agreement's continuing eight percent interest from January 31, 2009, until paid, adding that "Michael's indebtedness obligation to Rebecca after January 2009 is governed by the terms of the Settlement Agreement, which remain in effect in all respects."
Michael appeals the superior court's judgment.

III. STANDARD OF REVIEW
We apply basic contract interpretation principles to interpret a property division agreement incorporated into a divorce decree.[6] We treat the interpretation of contract language as a question of law and interpret the language de novo.[7]
We review orders denying Alaska Civil Rule 60(b) relief for abuse of discretion.[8] An abuse of discretion occurs when, after a review of the entire record, we are left with "a definite and firm conviction that the trial court has erred in its ruling."[9]

IV. DISCUSSION
The central issue in this appeal is whether the superior court's interpretation of the Agreement was incorrect and resulted in an inflated judgment against Michael. We also address Michael's contention that the superior court improperly refused to excuse him from all or part of his obligations under the Agreement because: (1) the Agreement was the result of a mutual mistake of fact; (2) Rebecca's alleged interference with potential investors constituted unclean hands; and (3) the court did not let him fully argue that he entered the Agreement under duress. Finally, we consider Michael's argument that the trial court should have granted him relief from prospective application of the Agreement pursuant to Alaska Civil Rule 60(b)(5) or (6).[10]

A. Michael's $2,000 Per Month Obligation Under Paragraph 2.b Of The Agreement Is Not Contingent On The Profitability Of The Corporations.
Michael's primary argument on appeal is that the superior court incorrectly interpreted the terms of the Agreement to require him to pay $2,000 per month even if the corporations were not profitable. He asserts that "[t]he more reasonable interpretation is that all payments in [paragraph 2.b] are dependent on the profitability of the subject corporations."
As stated above, we interpret contract language de novo.[11] Where the superior court considers extrinsic evidence in interpreting contract terms, however, we will review the superior court's factual determinations *1078 for clear error and inferences drawn from that extrinsic evidence for "support by substantial evidence."[12] In addition, we have long maintained that "[i]t is the function of the trial court, not of this court, to judge witnesses' credibility and to weigh conflicting evidence."[13]
In interpreting any contract, "[t]he goal ... is to give effect to the reasonable expectations of the parties."[14] This is accomplished "by looking first at the written agreement and also extrinsic evidence regarding the parties' intent at the time the contract was made."[15] To construe a divorce property settlement agreement "[a] court must resolve any ambiguity in contract language by determining the reasonable expectations of the contracting parties in light of the language of any disputed provisions, other provisions, relevant extrinsic evidence, and case law interpreting similar provisions."[16]
The superior court initially determined that it was not appropriate to strictly construe ambiguities in the Agreement in favor of the non-drafting party (Michael) because "[i]n reality, both sides carefully debated the provisions." This decision comports with our case law. While the general rule is that an ambiguous contract will be construed against its drafter,[17] we have cautioned that the rule is appropriate only "in the absence of other means of ascertaining the reasonable expectations of the parties."[18] Our decisions have also noted that a contract should only be construed against the drafting party for "contracts of adhesion where the parties are of such disproportionate bargaining power" that one party "could not have negotiated for variations in the terms of the standard policy."[19] It was thus appropriate for the superior court to decline to construe ambiguous terms strictly in favor of Michael.
To interpret the ambiguities in paragraph 2.b of the Agreement, the superior court considered the following: (1) words used in the Agreement; (2) the nature of the businesses when the Agreement was formed, which was that the corporations were "in their beginning, developing stages with the hope of future profitability"; (3) the parties' negotiations, which the trial court found favored Rebecca's interpretation; and (4) the three-tiered structure of the Agreement,[20] which reflected that "the parties expected that after five years the business would be viable and ongoing, but that Michael may not *1079 yet be able to take much income from the business" and that "[a]s the business grew and became more profitable ... the payments increased to include 50% of the income above that [$40,000] threshold." The superior court concluded based on these factors that Michael was obligated to pay half of any excess personal income from the corporations over $40,000 per year to Rebecca only if the corporations earned him at least $40,000, but that he was responsible for the $2,000 per month payment even if the corporations were not earning a profit.
Michael contends that the trial court's interpretation of the Agreement is "unnecessarily convoluted and benefits Rebecca at [his] expense," and that the "more reasonable interpretation" that is "fair to both parties" is that "all payments in tier two are dependent on the profitability of the subject corporations." Michael asserts that conditioning the $2,000 per month payments on the corporations' profitability is in line with Michael and Rebecca's negotiations and the testimony presented at the hearings on contract interpretation.[21]
We agree with the superior court's interpretation that the $2,000 per month payment in paragraph 2.b of the Agreement is not contingent on the profitability of the subject corporations.[22] The superior court properly looked to extrinsic evidence, including the nature of the business, the parties' negotiations, and the structure of the Agreement in interpreting the Agreement's terms. Record evidence supports interpreting the terms of the Agreement to mean that Michael is obligated to make the $2,000 per month payment even if the corporations are not providing him with over $40,000 in income (i.e., are not "profitable" by the parties' definition).
First, the language of the Agreement supports treating the $2,000 per month payment differently from the $40,000 threshold payment. The Agreement states that "[o]n May 1, 2007, Michael's monthly payments shall increase to $2,000" and in the next sentence adds that "[s]hould Michael's after tax income... from the two corporations exceed $40,000 a year, half of the excess shall be paid to Rebecca." This structure is inconsistent with applying the $40,000 in income trigger to the $2,000 per month payment. The Agreement also separates the two payment types by expressly ending the $2,000 per month obligation after 15 years, but continuing payments triggered by a corporate income of over $40,000 until the entire principal amount plus interest is paid off.
Second, Michael's concern at the time the Agreement was made was clearly that he would not have to "go out and get three jobs and try to pay off these [$6,000] or $7,000 a month payments." Construing the Agreement to require Michael to pay $2,000 per month does not implicate that concern, nor did Michael or his counsel object to Michael's having to fulfill a $2,000 per month obligation.
In addition, Michael's arguments in his March 15, 2002 motion to correct the settlement agreement terms suggest that he understood the $2,000 per month obligation as distinct from payments triggered when his income derived from the corporations reached $40,000. Michael described the parties' agreement as "that the only source of his payments, over the fixed monthly amounts, was to be half his income from the two corporations which exceeded $40,000." (Emphasis added.) This statement also indicates that Michael contemplated that his "fixed monthly amounts" might come from *1080 sources other than corporate income, and statements in Michael's reply in support of his motion to correct the settlement agreement terms support this reading. For example, Michael noted that "Rebecca agrees the $2,000/month payments will not amortize the $750,000 note if it is not paid off by the only possible source, half Michael's income from the two corporations over $40,000." This statement suggests that the $2,000 per month amount would be paid regardless of the $40,000 in income threshold being reached, and that a different "source" may fund the $2,000 per month installment.
Tellingly, nowhere in Michael's submissions in the trial court related to fixing the settlement terms did he contend that he would not owe the $2,000 per month amount if the corporations did not produce a significant profit. Moreover, while the final Agreement submitted in May 2002 included several significant changes and clarifications, including limiting the $2,000 per month payments to 15 years, it did not change the structure of the monthly payments, or add that they were dependent on profitability.
Finally, in his affidavit dated January 9, 2009, Michael stated that "[i]n May, 2007 I realized that it was going to be impossible for me to pay Rebecca $2,000 per month" and that he tried to "settle the case" with Rebecca. Michael later stated that he believed that he had reached a settlement with Rebecca and that she would take back her shares in both corporations. We have recognized that extrinsic evidence of a course of performance can aid contract interpretation because "[t]he parties to an agreement know best what they meant, and their action under it is often the strongest evidence of their meaning."[23] Michael's affidavit statement is not dispositive of the Agreement's meaning, but does indicate that Michael thought he was obligated to pay the $2,000 per month starting in May 2007 even though the corporations were not earning him over $40,000 in income. There would be no reason for Michael to try to settle or to agree to transfer stock back to Rebecca if, as Michael claimed, he did not owe Rebecca anything under the Agreement because the corporations were not producing profits.
We affirm the superior court's interpretation of the Agreement based on our review of the record and conclude that Michael was obligated to begin paying $2,000 per month to Rebecca on May 1, 2007.

B. The Superior Court Did Not Err In Enforcing The Agreement Against Michael.
We have noted that "there is a strong public policy in favor of the settlement of disputes," such that private settlements are favored and "should not be lightly set aside."[24] Still, settlement agreements must "meet minimal contractual requirements," including being entered into voluntarily and knowingly.[25]
Michael argues that the superior court should have relieved him from all or part of his obligations under the Agreement. Specifically, Michael asserts that the trial court committed error when it: (1) found no mutual mistake of fact that warranted rescission or reformation of the Agreement; (2) failed to exonerate Michael from his obligations based on the doctrine of unclean hands; and (3) refused to hear Michael's evidence that he entered the Agreement under duress. We consider whether the superior court erroneously enforced the Agreement and rejected Michael's defenses.

1. The superior court did not err in refusing to set aside the Agreement due to mutual mistake of fact.
Under Alaska law, "[w]hen the parties to an agreement share a mistaken *1081 belief about a material fact, the agreement may be voidable."[26] We use a three-part test to determine whether there is mutual mistake of fact: (1) whether the mistake relates to a basic assumption on which the contract was made; (2) whether the mistake has a material effect on the agreed exchange of performances; and (3) whether the party seeking relief does not bear the risk of the mistake.[27]
The superior court found that the Agreement was not premised on a mutual mistake of fact. The court emphasized that "mistake as to value of the subject matter in a contract is generally not a defense to formation." It added that the defense of mutual mistake of fact was not applicable because the "fact" of the value of the corporations was not a past or present fact, but rather a future prediction.
Michael reiterates on appeal that the Agreement is flawed and should have been set aside because he and Rebecca made a mutual mistake of fact in valuing the corporations.[28] Specifically, Michael objects to the superior court's finding that the mistaken valuation of the corporations was not a "past or present" fact.
The superior court did not err in refusing to void the Agreement on grounds of mutual mistake. Mistake as to value, like all incorrect predictions of a future event, is not a "mutual mistake" that warrants rescission. As the Montana Supreme Court case cited by the superior court summarizes:
[T]he fact that both parties mistook the value of the subject matter of the contract, so that one sold more of a thing or a more valuable thing than he thought he was selling, and the other received more than he expected to receive, is, according to the weight of authority, immaterial to the case.[[29]]
Following this explanation, the Montana court refused to rescind a contract on grounds that the parties mutually overvalued the purchased stock.[30] Moreover, the Restatement (Second) of Contracts explains that a mistaken stock valuation is not a "mistake" that voids a contract. Rather, "[a] party's prediction or judgment as to events to occur in the future, even if erroneous, is not a `mistake.'"[31] The Restatement gives this example:
A contracts to sell and B to buy stock amounting to a controlling interest in C Corporation. At the time of making the contract, both A and B believe that C Corporation will have earnings of $1,000,000 during the following fiscal year. Because of a subsequent economic recession, C Corporation earns less than $500,000 during that year. Although B may have shown poor judgment in making the contract, there was no mistake of either A or B....[[32]]
We have previously arrived at this same conclusion: An error concerning a future event does not constitute a mistake for purposes of contract rescission.[33] Other courts *1082 overwhelmingly agree.[34]
Here, Michael admitted that the value of the shares was "speculative." Michael and Rebecca's valuation was their agreed estimation of what the stock would be worth, for which they bore the risk that they might be incorrect. It was not error for the superior court to decide that the Agreement should not have been set aside for mutual mistake of fact.

2. It was not an abuse of discretion for the superior court to refuse to relieve Michael from his obligations under the doctrine of unclean hands.
The doctrine of unclean hands is an equitable defense that, in some cases, bars a plaintiff from claims in equity.[35] To successfully raise an "unclean hands" defense, a party must demonstrate: "(1) that the plaintiff perpetrated some wrongdoing; and (2) that the wrongful act related to the action being litigated."[36] Under the second part of this test, the wrongful act must be "so closely related to the matter in litigation ... as to affect the equitable relation of the parties to the suit."[37] In addition, the doctrine of unclean hands will not apply if the party asserting unclean hands fails to show harm resulting from the alleged wrongful conduct.[38]
Michael contends that the trial court improperly refused to apply the doctrine of unclean hands to exonerate him from his obligations under the Agreement.[39] He asserts that he "presented evidence showing that Rebecca had acted to sabotage his attempts to develop the corporations by her disparaging remarks to, among others, present and potential investors" and that this "interference ... has contributed to [his] difficulty in attaining the level of profitability necessary to avoid accumulating arrearages."
The superior court acknowledged that there was "evidence showing that Rebecca has made disparaging remarks."[40] But the court concluded that excusing Michael from his obligations under the Agreement was not "justified in equity" primarily because there was "no proof of the actual impact of Rebecca's comments on the corporations."
We will disturb a superior court's refusal to find unclean hands only if it is clearly erroneous[41]that is, if we are "left with a definite and firm conviction on the entire record that a mistake has been made."[42] And we review a trial court's decision *1083 on equitable relief for abuse of discretion.[43] The superior court did not find any record evidence showing that Rebecca's comments had any actual impact on current or potential investor's decisions, and a review of the record does not reveal any evidence that demonstrates that the superior court was mistaken. Refusing to relieve Michael from his obligations pursuant to his unclean hands defense was not an abuse of discretion.

3. The superior court did not prevent Michael from arguing his duress claim.
Michael contends that he tried to present evidence to the superior court showing that he entered the Agreement under duress but the superior court "refused to consider his arguments" and never permitted Michael to "fully argue the circumstances showing duress." But Michael devoted only a single paragraph to his duress claim in his motion to the superior court and did not provide any additional record support for his allegations. In addition, it appears that Michael's counsel failed to pursue the duress defense at the February 23, 2009 hearing. The superior court, albeit somewhat skeptically, asked Michael's counsel if he intended to make an economic duress argument, and then the follow exchange occurred:
Counsel: [N]o, I'm not, Your Honor.... I'm not talking about economic duress. I'm talking about the stress that you have as you're looking into an agreement and the importance of making an agreement.
....
Court: How does that affect what the agreement meant?
Counsel: I understand. We can withdraw that.
In short, nothing except perhaps Michael's counsel's decision not to develop this claim in his briefing or at the hearing prevented Michael from fully presenting his duress allegation to the superior court. Thus, the superior court properly declined to exonerate Michael's obligations on this ground.

C. The Superior Court Did Not Abuse Its Discretion By Declining To Modify The Agreement Pursuant To Alaska Civil Rule 60(b)(5) Or 60(b)(6).
Alaska Civil Rule 60(b)(5) permits a court to grant relief from a final judgment, order, or proceeding if "it is no longer equitable that the judgment should have prospective application."[44] Rule 60(b)(6) provides that relief may be granted for "any other reason justifying relief from the operation of the judgment."[45] Property divisions incorporated into divorce decrees are final judgments and are modifiable under Civil Rule 60(b) to the same extent as any final equitable decree of the court.[46] Relief from final judgments requires more than mere lack of prejudice on the part of the opponent.[47] Because of the interest in finality, Rule 60(b) "is not a substitute for a party failing to file a timely appeal; nor does it allow relitigation of issues that have been resolved by the judgment."[48]

1. Alaska Civil Rule 60(b)(5)
Rule 60(b)(5) provides for relief from judgments that are "no longer equitable" going forward.[49] The superior court determined that the Agreement was not unfair to Michael and so declined relief under Rule 60(b)(5). We will reverse a trial court's denial of Rule 60(b)(5) relief only where the trial court has abused its discretion.[50]
*1084 Michael does not advance any legal theory in support of his argument on appeal, and does not explain how applying the Agreement prospectively is inequitable besides reiterating that "[t]he parties overvalued the worth of the marital corporate stocks." Michael has not adequately briefed this argument on appeal,[51] and we detect no abuse of discretion in the superior court's finding that the parties' mistaken valuation did not warrant Rule 60(b)(5) relief.

2. Alaska Civil Rule 60(b)(6)
Rule 60(b)(6) is a catch-all provision and should be liberally construed to enable courts to vacate judgments whenever such action is necessary to accomplish justice.[52] But a party may only obtain Rule 60(b)(6) relief if no other Rule 60(b) clause applies and "extraordinary circumstances" exist.[53] In the context of a property division pursuant to a divorce, four "extraordinary circumstances" may justify relief under Rule 60(b)(6): (1) the fundamental, underlying assumption of the dissolution agreement has been destroyed; (2) the parties' property division was poorly thought out; (3) the property division was reached without the benefit of counsel; and (4) the property in dispute was the parties' principal asset.[54] Looking to these factors, we have affirmed grants of Rule 60(b)(6) relief from property divisions in situations where there was a post-judgment discovery that an ex-wife was not eligible by law for survivorship benefits in a civil service pension,[55] a post-dissolution creation of a government program that distributed individual fishing quotas,[56] and a dissolution decree that entirely failed to dispose of substantial items of marital property.[57]
Here, the superior court concluded that both Michael and Rebecca "took some calculated risks regarding their marital stock" and that it "surely would be inequitable to require no further payments from Michael when the corporations are still engaged in business and his payments are limited to $2,000/month." Michael argues on appeal that the fundamental underlying assumption of the Agreement was that the stocks "were actually worth the value placed on them" so that the corporations "would produce enough income to allow Michael to pay off a principal amount of $675,000 without ruining himself and his corporations."
We conclude that the superior court did not abuse its discretion in denying Rule 60(b)(6) relief. Whether the fundamental underlying assumption of the Agreement had been destroyed was fully addressed and rejected by the superior court. Significant to the court was the fact that the $2,000 per month payment ended at 15 years, after which Michael would have to pay Rebecca only if the corporations were significantly profitable. The trial court reasoned that this provision indicated that Michael and Rebecca "anticipated the chance the corporations would not be earning large profits after 15 years." Because the destruction of the alleged underlying assumption was in fact likely anticipated by the parties, these were not the kind of "extraordinary circumstances" that justify Rule 60(b)(6) relief, and the superior court did not err in denying Michael relief.

V. CONCLUSION
We AFFIRM the superior court's order and judgment against Michael in the amount of $47,132.46 plus continuing interest and AFFIRM that the $2,000 per month payment under paragraph 2.b of the Agreement is not dependent upon the profitability of the corporations.
NOTES
[1] Rebecca did not file a responsive brief in this matter.
[2] The superior court attributed this comment to Michael's attorney but the transcript shows Rebecca's attorney making the statement.
[3] Rebecca noted that, if the debt was still the full $750,000 after five years, monthly payments of $6,273.68 would be required to amortize a 20-year, eight percent interest debt and the motivation behind the payment plan requiring only $2,000 per month was that Michael would not have to get multiple jobs to "try to pay off ... $6,000 or $7,000 a month."
[4] We refer to the attorneys who represented Michael and Rebecca during the divorce trial and settlement negotiations in 2002 as "divorce counsel." During the proceedings on the motion to reduce the settlement agreement to judgment in 2008, Rebecca proceeded pro se and Michael was represented by counsel other than his divorce counsel.
[5] Michael satisfied that judgment on April 3, 2009.
[6] Burns v. Burns, 157 P.3d 1037, 1039 (Alaska 2007); see also Ford v. Ford, 68 P.3d 1258, 1263 (Alaska 2003) ("We analyze a settlement agreement under traditional contract principles.").
[7] Norton v. Herron, 677 P.2d 877, 880 (Alaska 1984).
[8] Morgan v. Morgan, 143 P.3d 975, 976 (Alaska 2006); Princiotta v. Municipality of Anchorage, 785 P.2d 559, 562 (Alaska 1990).
[9] Ford, 68 P.3d at 1263.
[10] Michael's final point in his appellate brief is that the superior court should have considered his ability to satisfy his obligations under the Agreement. Michael cites no legal authority for this position and so we do not address it. Wasserman v. Bartholomew, 923 P.2d 806, 816 (Alaska 1996) (deeming an argument waived where the party cited no authority and failed to provide a legal theory for the party's argument on appeal).
[11] Norton, 677 P.2d at 880.
[12] Burns v. Burns, 157 P.3d 1037, 1039 (Alaska 2007); see also Laughlin v. Laughlin, 229 P.3d 1002, 1004 (Alaska 2010).
[13] Knutson v. Knutson, 973 P.2d 596, 599-600 (Alaska 1999).
[14] Id. at 600.
[15] Brotherton v. Warner, 240 P.3d 1225, 1229 (Alaska 2010).
[16] Hartley v. Hartley, 205 P.3d 342, 347 (Alaska 2009) (internal quotation marks omitted); see also AAA Valley Gravel, Inc. v. Totaro, 219 P.3d 153, 160 (Alaska 2009) (explaining that where contract language is ambiguous courts should look to "[r]elevant extrinsic evidence" which includes "the parties' conduct, goals sought to be accomplished, and surrounding circumstances at the time the contract was negotiated").
[17] See RESTATEMENT (SECOND) OF CONTRACTS § 206 (1981) ("In choosing among the reasonable meanings of a promise or agreement or a term thereof, that meaning is generally preferred which operates against the party who supplies the words or from whom a writing otherwise proceeds.").
[18] Monzingo v. Alaska Air Group, Inc., 112 P.3d 655, 661 n. 29 (Alaska 2005).
[19] Little Susitna Const. Co. v. Soil Processing, Inc., 944 P.2d 20, 25 n. 7 (Alaska 1997) (internal quotation marks omitted) (finding that the jury was not required to construe ambiguity against the drafting party because the contract "was negotiated at arm's length between two equally situated parties"); see also RESTATEMENT (SECOND) OF CONTRACTS § 206 cmt. a Reporter's Note (1981) (noting that the rule "has less force when the other party has taken an active role in the drafting process, or is particularly knowledgeable").
[20] The superior court described the Agreement as having three tiers: "Tier one was the five years of unconditional payments of $1000 per month towards child support, arrearages, and the principal value of the stock. Tier two covered the next fifteen years after May 1, 2007, and had two payment possibilities: $2000 per month or $2000 per month plus one-half of the profits beyond $40,000 income to Michael. Tier three began after the fifteen years of tier two ended. No monthly payment of $2,000 was required, but Rebecca would be entitled to one-half of the corporation's income above $40,000 until the obligation to her was paid."
[21] Michael provides only hearing testimony from his divorce counsel and himself as record evidence in support of his argument. This type of support is unavailing in light of our case law explaining that "to give effect to the intention of the parties, looking to their testimony as to their subjective intentions or understandings will normally accomplish no more than a restatement of their conflicting positions. Thus, self-serving testimony is ordinarily not probative." Abood v. Abood, 119 P.3d 980, 986 (Alaska 2005) (internal citations omitted). The superior court also specifically noted that the testimony from the parties at the hearing was not helpful, and that neither witness was particularly credible.
[22] The superior court also determined that payments under paragraph 2.b of the Agreement were contingent on "success or failure" of the corporations. We do not reach the question whether this was correct because the record shows that the corporations are not insolvent or bankrupt, so the relevant factual scenario is not before us.
[23] Estate of Polushkin ex rel. Polushkin v. Maw, 170 P.3d 162, 170-71 (Alaska 2007) (quoting RESTATEMENT (SECOND) OF CONTRACTS § 202(4) cmt. g (1981) (cautioning that course of performance rule "does not apply to action on a single occasion or to action of one party only" but allowing that "in such cases the conduct of a party may be evidence against him that he had knowledge or reason to know of the other party's meaning")).
[24] Mullins v. Oates, 179 P.3d 930, 937 (Alaska 2008).
[25] Id. (citing Indus. Commercial Elec., Inc. v. McLees, 101 P.3d 593, 597 (Alaska 2004) (explaining that settlement agreements are "susceptible to attack for mistake, fraud, misrepresentation, and duress")).
[26] Stormont v. Astoria Ltd., 889 P.2d 1059, 1061 (Alaska 1995); see also RESTATEMENT (SECOND) OF CONTRACTS § 152 (1981) (explaining that a contract may be voidable where there was "a mistake of both parties at the time a contract was made as to a basic assumption on which the contract was made [which] has a material effect on the agreed exchange of performances").
[27] Wasser & Winters Co. v. Ritchie Bros. Auctioneers (Am.), 185 P.3d 73, 78 (Alaska 2008) (internal quotation marks omitted).
[28] We note that the situation here may be more accurately described as a unilateral mistake on Michael's part. But this type of unilateral mistake would not relieve Michael from his obligations under the Agreement. See Voss v. Brooks, 907 P.2d 465, 468 (Alaska 1995) (allowing contract reformation based on unilateral mistake only if there has been "fraudulent or inequitable" conduct by the other party).
[29] Knutson v. Bitterroot Int'l Sys., Inc., 300 Mont. 511, 5 P.3d 554, 559 (2000) (citing 17A C.J.S. Contracts § 149).
[30] Id.
[31] RESTATEMENT (SECOND) OF CONTRACTS § 151, cmt. a (1981).
[32] Id. illus. 2 (emphasis added).
[33] Stormont v. Astoria Ltd., 889 P.2d 1059, 1061 (Alaska 1995) (refusing to rescind a contract for mutual mistake of fact when parties believed that a building that was the subject of a commercial contract would not be demolished but it was) (citing Beals v. Tri-B Assocs., 644 P.2d 78, 80 (Colo.App.1982) ("If the parties harbor only mistaken expectations as to the course of future events and their assumptions as to facts existing at the time of the contract are correct, rescission is not proper.")).
[34] See Ryan v. Ryan, 220 W.Va. 1, 640 S.E.2d 64, 68-69 (2006) (collecting federal and state cases) (denying request to reform a divorce agreement because of a "mistaken" mutual belief that the asset provisions of the agreement would result in investments which would generate sufficient income to support ex-wife because "mistake" was simply incorrect prediction of future event).
[35] See 27A AM.JUR.2D Equity § 98. Although Rebecca did not initially seek any equitable relief, she eventually conceded that she could not accelerate future amounts owed under the Agreement. The superior court then awarded her legal relief in the form of monetary damages, as well as equitable relief in the form of an order that the terms of the Agreement remain in effect going forward.
[36] Knaebel v. Heiner, 663 P.2d 551, 554 (Alaska 1983).
[37] Id.
[38] 27A AM.JUR.2D Equity § 105.
[39] Michael argued in the superior court that Rebecca's conduct amounted to intentional interference with contract and breach of the implied covenant of good faith and fair dealing. The superior court found it "unnecessary to determine whether the conduct would sustain these separate tort claims" because "Michael's argument is essentially one for equitable relief under the doctrine commonly known as `unclean hands.'" Michael then asserted "the right to obtain equitable relief based on the doctrine of `unclean hands'" in his appellate brief.
[40] On March 11, 2009, the superior court issued a separate order granting Michael's motion for a protective order which stated that Rebecca "shall not contact anyone, including but not limited to current investors, potential investors, or any State or Federal Agency to discuss any businesses [Michael] is involved in."
[41] Gurney v. Gurney, 80 P.3d 223, 224 n. 2 (Alaska 2003).
[42] Cartee v. Cartee, 239 P.3d 707, 712 (Alaska 2010).
[43] In re Estate of Fields, 219 P.3d 995, 1002 (Alaska 2009).
[44] Alaska R. Civ. P. 60(b)(5).
[45] Alaska R. Civ. P. 60(b)(6).
[46] See Cline v. Cline, 90 P.3d 147, 151 (Alaska 2004); see also Hatten v. Hatten, 917 P.2d 667, 670 n. 3 (Alaska 1996) (noting that the rules governing relief from judgment on such grounds as mistake or fraud apply to property settlements incorporated into divorce decrees).
[47] Dickerson v. Goodman, 161 P.3d 1205, 1208 (Alaska 2007).
[48] Morris v. Morris, 908 P.2d 425, 429 (Alaska 1995).
[49] Alaska R. Civ. P. 60(b)(5).
[50] Princiotta v. Municipality of Anchorage, 785 P.2d 559, 562 (Alaska 1990); see also Hertz v. State, Dep't of Corr., 230 P.3d 663, 669 (Alaska 2010) ("Alaska Civil Rules 60(b)(5) and (6) give discretion to the trial court.").
[51] See supra note 10.
[52] Juelfs v. Gough, 41 P.3d 593, 597 n. 12 (Alaska 2002).
[53] Id. at 597.
[54] Powell v. Powell, 194 P.3d 364, 371 (Alaska 2008).
[55] Williams v. Crawford, 982 P.2d 250, 255-56 (Alaska 1999).
[56] McGee v. McGee, 974 P.2d 983, 987-90 (Alaska 1999).
[57] Lacher v. Lacher, 993 P.2d 413, 419-20 (Alaska 1999).