DA 07-0325

IN THE SUPREME COURT OF THE STATE OF MONTANA

2008 MT 361

FILED

October 28 2008

*Ed Smith*
CLERK OF THE SUPREME COURT
STATE OF MONTANA

BRIAN D. WHITEHORN,

     Plaintiff and Appellant,

   v.

WHITEHORN FARMS, INC., a Montana corporation;
EARL G. WHITEHORN; and WAYNE A. WHITEHORN,

     Defendants and Appellees.

WHITEHORN FARMS, INC., a Montana corporation;
EARL G. WHITEHORN; and WAYNE A. WHITEHORN,

     Counter-Plaintiffs,

   v.

BRIAN D. WHITEHORN and UNITY WITH GOD SOCIETY,

     Counter-Defendants.

APPEAL FROM:    District Court of the Twelfth Judicial District,
In and For the County of Chouteau, Cause No. DV 03-41
Honorable David Rice, Presiding Judge

COUNSEL OF RECORD:

     For Appellant:

          Ward E. Taleff; Taleff Law Office, Great Falls, Montana

     For Appellees:

          David G. Dennis; Church, Harris, Johnson & Williams,
Great Falls, Montana

Submitted on Briefs:  August 19, 2008
Decided:  October 28, 2008

Filed:

_____
Clerk

Justice Jim Rice delivered the Opinion of the Court.

¶1 This case arises from a dispute between the shareholders of a family farming corporation, Whitehorn Farms, Inc. Brian Whitehorn (Brian) brought suit in the Twelfth Judicial District Court, Chouteau County, claiming that he was an oppressed minority shareholder and that Whitehorn Farms, Inc. should be dissolved or forced to repurchase his shares in the corporation. Brian named Whitehorn Farms, Inc., Earl Whitehorn, and Wayne Whitehorn (collectively the "Corporation") as defendants. Brian's oppression claim was based on the Corporation's termination of him as an employee, officer, and director. The Corporation answered that its actions did not constitute oppression and counterclaimed against Brian for conversion of corporate property.

¶2 The District Court, sitting without a jury, denied Brian's request for relief and granted the Corporation's conversion claim. Brian appeals from the court's denial of his oppression claim. We affirm.

¶3 We restate the issues on appeal as follows:

¶4 Did the District Court err in holding that Brian Whitehorn was not an oppressed minority shareholder?

## FACTUAL AND PROCEDURAL BACKGROUND

¶5 The farmland owned by Whitehorn Farms, Inc. has been in the Whitehorn family since Chester Whitehorn homesteaded it in the early 1900's. Chester's sons, Stanley, Wallace, and Wayne Whitehorn, incorporated Whitehorn Farms in the 1960's. By 2001, Stanley's sons, Earl and Brian, had become shareholders, officers, directors, and employees, and had taken control of most of the farming operations.

2

¶6    Brian grew up on the farm, left for college in 1969, returned in 1975, and worked on the farm until 1980, when he took full-time employment with Columbia Grain in Great Falls. In 1985, Brian's employment with Columbia Grain ended and he began B & E Farms, Inc. with his brother Earl. Brian and Earl were not employees of Whitehorn Farms during the time they operated B & E Farms. B & E farmed parcels of land that it leased from third parties and also performed some contract farming for Whitehorn Farms. Brian and Earl operated B & E farms until 2000, at which time B & E lost its leases. B & E discontinued its operations in 2000, and merged with Whitehorn Farms in 2002.

¶7    Brian and Earl began working again for Whitehorn Farms in 2001 as employees, as well as being officers and directors, along with Stanley and Wayne. As employees they received a modest salary, health insurance, gas, vehicle use, housing, utilities, and groceries. Additionally, in-kind distributions of grain were occasionally given to the employees as bonuses. Whitehorn Farms' main shareholders are Earl, Brian, and Wayne; together they control over seventy-nine percent of the voting interest. Other family members hold small or future interests in corporate stock.

¶8    Brian received over fifty-three percent of his shares through gifts between 1989 and 2000. Another twenty-seven percent of his shares were purchased from other shareholders with the proceeds of two life insurance policies on Wallace Whitehorn. The Corporation had originally purchased the insurance plans and then transferred them to Brian with the intent that the proceeds from them be used to purchase shares of Whitehorn Farms stock. The only shares of stock Brian received after becoming employed by Whitehorn Farms in 2001 constituted less than five percent of his total

3

shares, which he acquired from the merger of B & E Farms into Whitehorn Farms. Brian became a director of Whitehorn Farms in 1991 and an officer in 2001.

¶9 In the late 1990's, Brian and his wife, Jacqueline Whitehorn, decided to construct a residence on land belonging to Whitehorn Farms. Whitehorn Farms deeded a parcel of land to them for no monetary consideration. In 1999, Brian proposed to transfer ownership of the residence and the land to Whitehorn Farms if Whitehorn Farms paid sixty thousand dollars toward Brian's construction loan on the residence. Whitehorn Farms agreed and paid the money, but Brian did not deed the property to the Corporation. At a Whitehorn Farms corporate meeting in 2001, Brian requested that the Corporation give Jacqueline a number of Whitehorn Farms shares as compensation for her investment in the residence. Based on Brian's representation that the residence now belonged to Whitehorn Farms, the Corporation agreed to give her 200 shares. At the 2002 shareholder meeting, without disclosure from Brian that he had not deeded the property to the Corporation, the Corporation gave Jacqueline the 200 shares. Moments later, she announced that the property had not been deeded back to Whitehorn Farms. Immediately following this startling disclosure, Brian proposed that the house would be transferred to the Corporation if all of the shares held by Jacqueline were purchased for a specified amount. Brian and Jacqueline were then in the process of dissolving their marriage. The Corporation declined. Nine days later, Brian deeded the property to Jacqueline as part of their marital settlement agreement.

¶10 In September 2002, Brian asked Earl to issue Brian's salary checks payable to "Unity with God Society," a Nevada Corporation Sole which Brian had formed to protect

his assets from a judgment creditor. After discussing it with the Corporation's accountant, Earl denied Brian's request.

¶11 In late October 2002, the officers of Whitehorn farms met and agreed to pay each employee an in-kind distribution of 2,500 bushels of grain. Shortly thereafter, Brian delivered 2,997.93 bushels of grain to Cereal Food Processors, Inc. (CFP). Brian directed CFP to credit the grain to the account of the "Unity with God Church." Brian wanted to sell the grain on a "basis" or futures contract instead of for cash, but was advised that CFP had a 5,000 bushel minimum for selling on a basis contract. Thus, on November 4, Brian delivered an additional 2,119.14 bushels to CFP, for a total of 5,117.08 bushels. The entire amount was credited to the Unity with God Church account. This constituted 2,617.08 bushels in excess of what Brian had been authorized to take as an in-kind distribution. Further, Brian could have satisfied CFP's 5,000 bushel minimum by combining his 2,500 bushel share with the remaining bushels being placed in the name of the Corporation, but he did not. On December 2, 2002, at Brian's direction, CFP issued a check to Unity with God Church for $22,280.47, as payment for all of the bushels Brian had delivered.

¶12 Customarily, grain scale tickets were provided to Earl within a day or two of the Corporation's grain deliveries. However, on this occasion, Brian did not deliver the scale tickets for a month, despite requests to do so from Earl.

¶13 Sometime in December, Brian left a note for the other officers explaining that the excess bushels he had taken were a lump-sum, in-kind payment of his salary for November, December, and first ten months of 2003. He stated his belief that this would

5

reduce the Corporation's FICA taxes. Brian then left on a vacation to several distant states for several months, knowing that there was disagreement with his actions and doing nothing to correct or address the problem. In January 2003, Earl discovered that Brian had opened an unauthorized account in the name of Whitehorn Farms at a business and had charged a number of personal items to this corporate account.

¶14 Brian did not seek permission to take the extra bushels, either before or after his deliveries to CFP. Nor was Brian authorized to unilaterally approve and receive a distribution of grain, change the method of his employment compensation, or change the timing of his compensation.

¶15 The other officers, directors, and shareholders of the Corporation viewed Brian's actions of taking the additional bushels as theft or conversion. They held a special meeting on February 17, 2003, and removed Brian as a director, officer, and employee of the Corporation. The special meeting was properly noticed and Brian received notice of the meeting, but did not attend.

¶16 Brian filed his petition for this action on November 5, 2003. On January 27, 2004, Whitehorn Farms held its annual shareholder meeting for the 2003 tax year. Brian attended and actively participated in the meeting. Prior to voting on directors, Brian was advised of his ability to cumulate his votes and vote for any candidate he chose. Brian made no effort to nominate or elect himself and instead nominated and moved to re-elect the current directors.

¶17 After a trial without a jury, the District Court issued its Findings of Fact, Conclusions of Law and Order on March 30, 2007. The court held that the Corporation

6

had acted reasonably in response to Brian's actions, and that Brian was not an oppressed minority shareholder. Additionally, the court held Brian liable for conversion of corporate assets. Brian appeals from the District Court's holding that he is not an oppressed minority shareholder.

## STANDARD OF REVIEW

¶18 A district court's findings of fact are reviewed to determine whether the findings are clearly erroneous. *Hidden Hollow Ranch v. Fields*, 2004 MT 153, ¶ 21, 321 Mont. 505, ¶ 21, 92 P.3d 1185, ¶ 21. A district court's findings are clearly erroneous if substantial credible evidence, does not support them, if the trial court has misapprehended the effect of the evidence, or if a review of the record leaves this Court with the definite and firm conviction that a mistake has been committed. *Ray v. Nansel*, 2002 MT 191, ¶ 19, 311 Mont. 135, ¶ 19, 53 P.3d 870, ¶ 19. We review a district court's conclusions of law for correctness. *Hidden Hollow*, ¶ 21.

## DISCUSSION

**Did the District Court err in holding that Brian Whitehorn was not an oppressed minority shareholder?**

¶19 On appeal, Brian raises several individual issues, including whether the District Court erred by disregarding his reasonable expectations as a shareholder to be able to access the value of his shares, and whether the District Court erred by not considering the Corporation's fiduciary duties *to* Brian as a shareholder, and instead improperly considered only Brian's actions. All of the stated issues are closely related to Brian's central contention that the District Court erred by ultimately concluding that he is not an

7

oppressed minority shareholder. Thus, we will discuss Brian's sub-issues within the context of this central issue.

¶20 The Corporation responds that Brian is arguing a new theory of the case on appeal. It asserts that Brian claimed oppression by way of the Corporation's termination of his employment in the District Court, and now argues that he has suffered oppression of shareholder rights by the Corporation's failure to buy out his stock interest. It contends that Brian should be estopped from arguing a new theory on appeal. Alternatively, the Corporation argues that the District Court did not err and that Brian is not an oppressed shareholder because the Corporation took reasonable actions to address Brian's wrongdoings.

¶21 Taking up the Corporation's procedural argument first, our rule with regard to arguments presented for the first time on appeal is well established. "The general rule in Montana is that this Court will not address either an issue raised for the first time on appeal or a party's change in legal theory." *Becker v. Rosebud Operating Servs., Inc.*, 2008 MT 285, ¶ 17, 345 Mont. 368, ¶ 17, 191 P.3d 435, ¶ 17 (internal citation and quotation omitted).

¶22 Brian's primary argument in the District Court was that he was oppressed by being terminated as an employee and officer. The District Court held that he had not been oppressed, and was liable for conversion. Not directly challenging the conversion holding on appeal, Brian argues that the Corporation nonetheless oppressed him as a shareholder, even if removing him as an employee, director, and officer was not oppression. Brian's argument on appeal could be summed up by his briefing statement

8

that "[h]is reasonable expectations as a shareholder were distinct from those as an employee, yet the corporation and the district court failed to separate the two." In essence, Brian contended in the District Court that the Corporation should buy his shares from him *because* of oppression, but his appellate contention is primarily that the lack of access to his shares *constitutes* oppression.

¶23 While this altered approach may be, without more, an impermissible change of argument on appeal, Brian also asserted in his complaint that the Corporation had oppressed him as a shareholder, and the District Court addressed, albeit briefly, the issue of shareholder oppression. Consequently, we conclude that Brian's appellate argument, while clearly a change in emphasis, is not an entirely new theory, and that excluding consideration of his arguments would be an unduly harsh application of the rule.

### Applicable Law

¶24 The Montana Code Annotated provides that a district court may dissolve a corporation if "the directors or those in control of the corporation have acted, are acting, or will act in a manner that is illegal, *oppressive*, or fraudulent." Section 35-1-938(2)(b), MCA (2001) (emphasis added). Additionally, § 35-1-939(1)(d), MCA, provides that the court has the discretion to grant relief other than dissolution, including an order "providing for the purchase at fair value of shares of any shareholder, either by the corporation or by other shareholders."

¶25 In *Fox v. 7L Bar Ranch Co.*, 198 Mont. 201, 209, 645 P.2d 929, 933 (1982), this Court discussed shareholder oppression in the context of a family corporation:

9

> Oppression may be more easily found in a close-held, family corporation than in a larger, public corporation. The reason for such a rule is obvious. Shares in a closely held corporation are not offered for public sale. Without readily available recourse to the market place, a dissatisfied shareholder is left with severely limited alternatives if one group of shareholders chooses to exercise leverage and "squeeze" the dissenter out.

(Internal citations and quotations omitted.)

¶26 In *Fox*, we further explained that "[t]here are a number of definitions of 'oppressive conduct' found in case law . . . [I]t is stated that to a great extent, a definition of 'oppressive' depends on the special nature of close corporations as understood by the statute, relevant commentators, and case law." *Fox*, 198 Mont. at 209, 645 P.2d at 933 (internal citations and quotations omitted). We then offered three definitions or approaches for analyzing oppression: whether there has been "harsh, dishonest or wrongful conduct and a visible departure from the standards of fair dealing which inure to the benefit of [the] majority and to the detriment of the minority;" an analysis of "the 'fiduciary duty' of good faith and fair dealing owed by majority shareholders to the minority;" and an assessment of "the reasonable expectations of the minority shareholders in light of the particular circumstances of each case." *Fox*, 198 Mont. at 209-10, 645 P.2d at 933 (citations and quotations omitted). Portions of these definitions are incorporated within Brian's arguments, which are directed toward the subjects set forth below.

**Lack of Access to Share Value**

¶27 Brian argues that the value of his investment is tied up in the Corporation and therefore he has been "completely divested of his assets as a shareholder . . . ." Brian

10

fails to point to any "dishonest or wrongful conduct" by the Corporation, *Fox*, 198 Mont. at 209, 645 P.2d at 933, but provides the following general reasons why the value of his shares are locked in and he has thus been oppressed: his inability to sell his shares or to receive any current benefit from them because they are not marketable, the Corporation's policy of not paying dividends, and the Corporation's failure to repurchase his shares. Brian further argues that the District Court erred by failing to consider his separate rights as a shareholder in addition to his rights as an employee.

¶28 However, Brian has not demonstrated how the "oppressions" about which he complains are different than those borne by other shareholders of the Corporation. The fact that his shares are not marketable is typical of closely held corporations generally and is likewise true of Whitehorn Farms. The articles of incorporation contain no provision providing a right to have shares purchased by the corporation or other shareholders. Brian complains that the Corporation pays no dividends, but he is well aware from his long involvement with the Corporation that it has historically not paid dividends. While failing to issue dividends to shareholders could be an oppressive tactic, the mere non-issuance of dividends is not oppressive in all circumstances. Here, the District Court concluded that neither Brian nor Earl had any capital investment—having received their shares as gifts—which would lead to an expectation of profits, and that "[o]nly their employment by the farm caused them to receive the full benefits as employees and officers, just the same as they saw received by their father and uncle." Brian does not directly challenge the District Court's conclusion that the termination of his employment was justified and thus, without other evidence of oppressive intent, the

11

Corporation's failure to pay dividends is insufficient to establish oppression. Lastly, Brian complains that the Corporation has not repurchased his shares. The articles of incorporation do not mandate such a purchase, and Brian fails to point to any authority that requires a corporation to repurchase the shares of a shareholder merely because the shareholder wants out of the corporation. Thus, in every regard, Brian appears to be in the same position as all the other shareholders. Only those employees and officers who contribute to the operation of the Corporation accrue additional benefits, and Brian does not contest his loss of those positions. Brian's significant stock interest in the Corporation does have value, and he may yet sell his interest to other shareholders or to the Corporation. However, given the lack of evidence of oppressive intent, there is no reason he is entitled to an order forcing the Corporation to repurchase his shares.

¶29 Brian also asserts there has been an "effective severance of Brian's rights as a shareholder" and that the District Court failed to consider his separate rights as a shareholder. However, although the District Court, reflecting the emphasis of Brian's case before it, did not analyze this issue in depth, it did consider the claim, noting that "[Brian] cannot complain to this court or anyone else about his current situation as a shareholder who is receiving nothing from his shares. The Court did not receive any evidence that Brian was being squeezed out of participation as a shareholder." Brian did not present evidence of any inhibition upon the exercise of his shareholder rights, and on appeal he has not challenged the District Court's finding of fact that, at a shareholder meeting after Brian had been terminated as an employee, he was advised that he could

cumulate his votes and nominate and attempt to elect himself to the board of directors.[1]

Indeed, while Brian chose not to nominate himself, he participated as a shareholder by nominating and moving to re-elect the current directors.

### Reasonable Shareholder Expectations

¶30 Brian argues that he "had a reasonable expectation that he would retain his stock value, which he regarded as his inheritance, regardless of his status as an employee or officer of the corporation." We have explained that the expectations of a shareholder in a closely held corporation "must be gleaned from the evidence presented. That is the province of the District Court . . . ." *Fox*, 198 Mont. at 210, 645 P.2d at 933 (internal citation omitted).

¶31 Assessing Brian's reasonable expectations, the District Court made two holdings. As alluded to in the above discussion, the District Court first held that because Brian acquired a vast majority of his shares by gift and at a time when he was receiving no benefit from them, he had no *capital* investment that would lead to a reasonable expectation of benefit from holding his shares. Second, the District Court held that only Brian and Earl's "employment by the farm caused them to receive the full benefits as employees and officers . . ." and that his reasonable expectations in continuing to receive these benefits were destroyed by his own wrongful actions.

¶32 Brian has failed to point to any reasonable expectation as a shareholder that has been violated. As demonstrated above, a shareholder's expectations within this

---

[1] This shareholder meeting occurred shortly after Brian had filed suit, but Brian does not challenge the District Court's reliance upon the meeting.

corporation were necessarily limited and, importantly, there is no evidence of an intention to "exercise leverage and 'squeeze' the dissenter out." *Fox*, 198 Mont. at 209, 645 P.2d at 933. The only benefits Brian lost were those associated with his status as an employee and officer, which he had no reasonable expectation to retain after he converted the Corporation's property. Any expectation regarding his right to participate in the management has not been violated because he can, and has, participated as a shareholder in nominating and electing directors. Indeed, he has been encouraged to do so by the Corporation.

### Fiduciary Duty

¶33 Brian argues that the majority shareholders breached their fiduciary duty to him by taking punitive and unnecessary actions against his shareholder rights, while his actions, though perhaps wrongful, were not a breach of his corresponding fiduciary duties as a shareholder. He argues the District Court improperly focused on his actions, and overlooked the duties of the Corporation and the other shareholders to him. Brian also argues that the Corporation's response to his actions was oppressive because the Corporation had less harmful alternatives.

¶34 "[T]he fiduciary duty between stockholders of a close corporation is one of the utmost good faith and loyalty. However, the controlling group should not be stymied by a minority stockholder's grievances if the controlling group can demonstrate a legitimate business purpose and the minority stockholder cannot demonstrate a less harmful alternative." *Daniels v. Thomas, Dean & Hoskins, Inc.*, 246 Mont. 125, 137-38, 804 P.2d 359, 366 (1990) (internal quotation omitted). Additionally, fiduciary duties run between

all shareholders, not just from majority shareholders to minority shareholders. *Sletteland v. Roberts*, 2000 MT 382, ¶ 30, 304 Mont. 21, ¶ 30, 16 P.3d. 1062, ¶ 30.

¶35 Brian argues that the Corporation had less harmful alternatives than removing him as an officer and employee. Brian asserts that in response to his conversion of the grain and other breaches of duty to the Corporation, the Corporation should have merely required him to pay back the value of the grain taken and attempted to limit his authority as an employee and officer.

¶36 We note that Brian's assertions about the shareholder's punitive actions and the Corporation's less harmful alternatives relate to the actions taken to remove him as an employee and officer, and not to any treatment of him as a minority shareholder. The District Court held that the majority shareholders did not breach their fiduciary duties to him as an employee and officer because "[d]ue to [Brian's] acts, it was reasonable for the other shareholders to conclude that there were no measures short of termination to assure that he would not do further damage to the corporation." We would be hard pressed to disagree, and the District Court's conclusion that "Brian Whitehorn has reaped what he sowed" appears apt. Clearly, there was a "legitimate business purpose," *Daniels*, 245 Mont. at 138, 804 P.2d at 366, in the actions taken against Brian as an employee and officer. The alternatives which Brian suggests do not apply to him as a minority stockholder and, thus, a reasonable alternative in that regard has not been suggested by the evidence. The District Court rightly concluded that no fiduciary duty to Brian had been breached.

15

¶37 Lastly, Brian asserts that the District Court erred by considering his actions and by failing to focus on the actions of the Corporation. He argues that his actions were irrelevant because he did not harm the Corporation. However, in assessing the Corporation's claim for conversion, the court recognized that the claim must show resulting damages and concluded that the Corporation had indeed been harmed by Brian's actions, a holding which Brian has not challenged on appeal. Further, the court could not have determined the propriety of the Corporation's response without considering what it was responding to—Brian's actions. Thus, the court properly considered the duties and actions of all the parties.

¶38 The District Court did not clearly err in entering its findings of fact or make incorrect conclusions of law. Its determination that Brian was not an oppressed shareholder is affirmed.

/S/ JIM RICE

We concur:

/S/ KARLA M. GRAY
/S/ JAMES C. NELSON
/S/ JOHN WARNER
/S/ BRIAN MORRIS