OP 10-0493

IN THE SUPREME COURT OF THE STATE OF MONTANA

2011 MT 324

H. ROBERT WARREN; JOAN CROCKER,

        Plaintiffs and Appellants,

    v.

CAMPBELL FARMING CORPORATION;
STEPHANIE GATELY; ROBERT GATELY,

        Defendants and Appellees.

| | |
|---|---|
| ORIGINAL PROCEEDING: | Certified Question from the Tenth Circuit Court of Appeals<br>Honorable Wade Brorby, Senior Circuit Judge |

COUNSEL OF RECORD:

        For Appellants:

                Mary E. Duncan (argued), Laurence R. Martin; Felt, Martin, Frazier &
                Weldon, P.C.; Billings, Montana

        For Appellees:

                Clinton W. Marrs (argued); Tax Estate & Business Law, LTD;
                Albuquerque, New Mexico

                Patrick D. Dougherty, Worden Thane P.C.; Missoula, Montana

                        Argued: September 16, 2011
                     Submitted: September 22, 2011
                      Decided: December 30, 2011

Filed:

                    _____

                             Clerk

Justice Jim Rice delivered the Opinion of the Court.

¶1 On October 7, 2010, the United States Court of Appeals for the Tenth Circuit certified to this Court questions of Montana law related to this matter. *Warren v. Campbell Farming Corp.*, No. 09-2169, 400 Fed. Appx. 312, 2010 U.S. App. LEXIS 24152 (10th Cir. Oct. 7, 2010) (unpublished). The Tenth Circuit Court's order set forth three certified questions, which it acknowledged could be reformulated by this Court, the factual and procedural background, a summary of the District Court's decision, a summary of the parties' arguments, and a statement of reasons for the certification request. The Tenth Circuit Court also submitted a copy of the District Court's decision and copies of the documents filed in that Court.

¶2 Pursuant to M. R. App. P. 15, we accepted the certified questions based upon the factual and procedural background provided by the Tenth Circuit Court and, following briefing by the parties, oral arguments were heard on September 16, 2011. We address the Tenth Circuit Court's questions as posed:

(1) Can the safe harbor provision of § 35-1-462(2)(c), MCA, be extended to cover a conflict-of-interest transaction involving a bonus that lacks consideration and would be void under Montana common law?

(2) Does the business judgment rule apply to situations involving a director's conflict-of-interest transaction?

(3) Does the holding in *Daniels v. Thomas, Dean & Hoskins, Inc.*, [246 Mont. 125, 136-39], 804 P.2d 359, 365-67 (Mont. 1990), which appears to adopt an alternative test for evaluating whether there has been a

2

breach of fiduciary duties by a controlling shareholder in a closely-held corporation, apply to a transaction that involves a conflict of interest?

¶3 Defendant Campbell Farming Corporation (Campbell or the company) is a closely-held Montana corporation with a principal place of business in New Mexico. During the relevant period, Campbell's shares were controlled by three shareholders: Defendant Stephanie Gately (Stephanie) controlled 51% of the shares, and Plaintiffs H. Robert Warren (Warren) and Joan Crocker (Crocker) controlled the remaining 49%. The company's president was Defendant Robert Gately (Robert), who is Stephanie's son. Stephanie, Robert and Warren were also the three directors of the company.

¶4 The disputed transaction was a proposal by Stephanie, made in her capacity as a director, to award a bonus to Robert in the form of company stock and cash valued at $1.2 million "to compensate him for past service to the company and to prevent him from resigning." *Warren*, 400 Fed. Appx. at 312, 2010 U.S. App. LEXIS 24152 at ** 2-3. Robert was not required to sign an agreement or fulfill any conditions to receive the bonus. Warren requested that Stephanie's proposal be voted on by the shareholders. Warren and Crocker voted their shares against the bonus and Stephanie voted her 51% interest in favor, resulting in approval of the bonus.

¶5 Warren and Crocker filed a derivative and direct action against the company and the Gatelys in New Mexico federal district court seeking to void the bonus, asserting breach of statutory and fiduciary duties and waste of corporate assets, and making common law claims. Warren and Crocker sought restitution from the Gatelys,

consequential or incidental damages suffered by the company, punitive damages from the Gatelys, equitable or injunctive relief, and attorney fees. A bench trial was conducted.

¶6 The District Court rejected Defendants' arguments that the bonus was permissibly paid under § 35-1-115(11), MCA, which permits directors to fix their own compensation, and § 35-1-115(12), MCA, which authorizes corporations to establish "share bonus plans" and other similar plans, concluding these sections were inapplicable. Noting that "R. Gately was not required to sign an employment contract in order to receive the bonus and was free to leave the Company at any time," the District Court ruled that, under Montana common law, the bonus lacked consideration because it was awarded for past services, but analyzed it as a director's conflicting interest transaction under § 35-1-461(2), MCA. The District Court determined that the bonus was valid under the "safe harbor" provision of § 35-1-462(2)(c), MCA, because it was "fair" to the company, reasoning that "[t]here is no reason to believe Montana courts would not extend such a safe harbor to bonuses awarded for past services." The District Court analyzed the actions of Gatelys as directors under the business judgment rule, and concluded the rule was satisfied. Finally, the District Court considered Plaintiffs' claim that Stephanie, as the majority shareholder, violated her fiduciary duties to them as minority shareholders. The District Court rejected the claim pursuant to *Daniels*, reasoning that the majority shareholder[1] demonstrated a legitimate business purpose for her actions while the

---

[1] Stephanie did not individually own a majority of the company's shares, but controlled the voting rights of a majority interest.

minority shareholders did not demonstrate a less harmful alternative. The District Court entered judgment in favor of the Defendants.

¶7 On appeal to the Tenth Circuit, the Plaintiffs argued: that the District Court ignored controlling Montana common law, created a new rule of law that a conflict of interest bonus transaction lacking consideration may be upheld if a trial court deems it "fair," and created a novel exception to the requirement of contractual consideration, but only for conflicted directors; that the business judgment rule does not apply to director conflict of interest transactions; and that the District Court erred in applying *Daniels* to this case. Deeming the issues presented as "state-law issues of first impression in Montana" and "dispositive of the issues in this case," the Tenth Circuit certified the questions to this Court. *Warren*, 400 Fed. Appx. at 315, 2010 U.S. App. LEXIS 24152 at * 9.

¶8 ***(1) Can the safe harbor provision of § 35-1-462(2)(c), MCA, be extended to cover a conflict-of-interest transaction involving a bonus that lacks consideration and would be void under Montana common law?***

¶9 In accordance with the questions framed by the Tenth Circuit Court, we assume for purposes of this opinion that the bonus in question lacked consideration and involved a director conflict of interest.

¶10 Campbell is a "closely-held" corporation, but did not elect to become a statutory close corporation under the Montana Close Corporation Act, §§ 35-9-101 et seq., MCA. Therefore, the certified questions must be analyzed under the Montana Business Corporation Act (MBCA). *See Daniels*, 246 Mont. at 134, 804 P.2d at 364 (claims

5

involving closely-held corporations "are governed by the provisions of the Montana Business Corporation Act"). The MBCA was enacted in 1991 and patterned after the American Bar Association's Revised Model Business Corporation Act (RMBCA). *See* John J. Oitzinger, *Fair Price and Fair Play under the Montana Business Corporation Act*, 58 Mont. L. Rev. 407, 407-08 (1997) ("the [Montana] legislature enacted an essentially unchanged version of the American Bar Association's Revised Model Business Corporation Law"). Because the MBCA is very similar to the model act, including the safe harbor provision, the Official Comments to the RMBCA are instructive. The "key objectives" of the RMBCA "'are to increase predictability and to enhance practical administrability. . . . [T]he new subchapter spells out a safe harbor procedure more meticulously than its predecessors.'" Official Comments to § 35-1-461, MCA, at 627-28 (2010 Annotations) (quoting 2 *Model Business Corporation Act Annotated* [hereinafter *MBCA Annotated*], Introductory Comments to Subchapter F, at 8-370 through -371 (3d ed. ABA 2002 & Supp. 2002); *see also* Committee on Corporate Laws, *Changes in the Model Business Corporation Act—Amendments Pertaining to Directors' Conflicting Interest Transactions*, 44 Bus. Law. 1307, 1308 (1989) (referenced in the 2010 Annotations as well as the 1991 legislative record).

¶11 The "safe harbor" procedure is found at §§ 35-1-461 through -464, MCA. Section 35-1-461, MCA, provides the pertinent definitions, and illustrates that a "'conflicting interest'" is one which a director has with regard to the subject transaction:

As used in 35-1-461 through 35-1-464, the following definitions apply:

(1) "Conflicting interest" with respect to a corporation means the interest a director of the corporation has respecting a transaction effected or proposed to be effected by the corporation . . . if:

(a) regardless of whether the transaction is brought before the board of directors of the corporation for action, the director knows at the time of commitment that he or a related person is a party to the transaction or has a beneficial financial interest in or is so closely linked to the transaction and the transaction is of such financial significance to the director or a related person that the interest would reasonably be expected to exert an influence on the director's judgment if the director were called upon to vote on the transaction . . . .

.    .    .

(2) "Director's conflicting interest transaction", with respect to a corporation, means a transaction effected or proposed to be effected by the corporation . . . in which transaction a director of the corporation has a conflicting interest.

(3) "Related person" means:

.    .    .

(b) a child, grandchild, sibling, parent or spouse of any child, grandchild, sibling, or parent of the director . . . .

Section 35-1-461(1)-(3), MCA (2003). In turn, § 35-1-462(2), MCA, contains the three mechanisms by which transactions tainted by conflicting interests can nonetheless be immunized from challenge:

(2) A director's conflicting interest transaction may not be enjoined, set aside, or give rise to an award of damages or other sanctions in a proceeding by a shareholder or by or in the right of the corporation because the director or any person with whom the director has a personal, economic, or other association has an interest in the transaction if:

(a) directors' action respecting the transaction was at any time taken in compliance with 35-1-463;

(b) shareholders' action respecting the transaction was at any time taken in compliance with 35-1-464; or

(c) the transaction, judged according to the circumstances at the time of commitment, is established to have been fair to the corporation.

7

Section 35-1-462(2), MCA. As amplified in the Official Comments, "[i]f the procedure set forth in section 8.62 [§ 35-1-463, MCA] or in section 8.63 [§ 35-1-464, MCA] is complied with, or if the transaction is fair to the corporation [§ 35-1-462(2)(c), MCA], then a director's conflicting interest transaction is immune from attack on any ground of a personal interest or conflict of interest of the director." 2 *MBCA Annotated*, Official Comments to § 8.61, at 8-397 (Supp. 1997); *see also* Committee on Corporate Laws, 44 Bus. Law. at 1322.[2]

¶12     In their arguments, Plaintiffs equate the term "transaction" used in these provisions with the term "contract." Because Robert's bonus lacked consideration, and was unenforceable as a contract, Plaintiffs argue, without citation to specific authority, that "'fair' does not include transactions that would not stand alone otherwise. . . . Where no contract exists, because there was no consideration, there is simply no transaction for the Court to consider at all." In other words, Plaintiffs assert that, as a matter of law, the bonus proposed here is not eligible for review and approval under the safe harbor procedure. Defendants respond that "[n]ot every bonus awarded to a deserving employee is awarded pursuant to contract," and therefore, "there is no obstacle to a director's

_____

[2] Sections 35-1-461 through -464, MCA, pertain only to a *director's* conflict of interest transaction, making no mention of a *shareholder's* conflict of interest. *See* 2 *MBCA Annotated*, Introductory Comments to Subchapter F, at 8-374 (Supp. 1997) ("[S]ubchapter F [§§ 35-1-461 through -464, MCA] deals with directors only."). The District Court analyzed Stephanie's actions in proposing Robert's bonus in her capacity as a director, stating: "[T]he fact that S. Gately proposed the bonus in her capacity as a director but the bonus ultimately was referred to the shareholders for approval prior to any action by the Board does not change the fact that it was a director's conflicting interest transaction at its inception and the Court will apply Section § 35-1-461 of the MBCA to the transaction." (Footnotes omitted.) We also analyze this question in the context of Stephanie's role as director, not as shareholder.

decision to propose or vote on such a bonus, despite a conflict-of-interest, so long as it otherwise met the safe harbor requirements." Thus, the issue is whether the bonus constitutes a "transaction" which is eligible for review under the safe harbor provision.

¶13 We have not previously considered the meaning of "transaction" in this context, and the term is not expressly defined in the statutory scheme. However, the safe harbor provision defines "'[t]ime of commitment' respecting a transaction" as "the time when the transaction is consummated *or, if made pursuant to contract,* the time when the corporation . . . becomes contractually obligated so that its unilateral withdrawal from the transaction would entail significant loss, liability, or other damage." Section 35-1-461(5), MCA (emphasis added). The implication of this provision is that a contract is one way, but not the only way, a transaction can be undertaken, and that "transaction" was intended to have a more expansive meaning than merely one of contract, which requires discrete legal elements for its existence. *See* § 28-2-102, MCA; *Knutson v. Bitterroot Intl. Systems, Inc.*, 2000 MT 203, ¶ 20, 300 Mont. 511, 5 P.3d 554 (a contract requires (1) identifiable parties capable of contracting, (2) the parties' consent, (3) a lawful object, and (4) sufficient cause or consideration). This view is consistent with the Legislature's revision of prior law. Prior to enactment of the MBCA, the predecessor safe harbor provision stated as follows:

> **Director conflicts of interest.** (1) No *contract or other transaction* between a corporation and one or more of its directors . . . is either void or voidable because of such relationship or interest . . . if:

9

(a) the fact of such relationship or interest is disclosed or known to the board of directors or committee which authorizes, approves, or ratifies the *contract or transaction* by a vote or consent . . . without counting the votes or consents of such interested directors;

(b) the fact of such relationship or interest is disclosed or known to the shareholders . . . and they authorize, approve, or ratify such *contract or transaction* by vote or written consent, in which vote or consent such interested directors may participate to the extent that they are also shareholders; or

(c) the *contract or transaction* is fair and reasonable to the corporation.

Section 35-1-413(1), MCA (1989) (emphases added). With its enactment of the MBCA, the Legislature employed only the broader concept of transaction and generally eliminated the former designation of contract as a subspecies of transaction ("contract or other transaction"), although vestiges of this distinction remain evident within § 35-1-461(5), MCA, as discussed above.

¶14 Here, the District Court determined that, under Montana law, the bonus lacked consideration and could not constitute a valid contract. This conclusion is appropriate, as the notion of contract does not fit the facts: Campbell undertook no obligation to pay the bonus to Robert, and Robert made no enforceable promises in order to receive it. However, the inquiry does not end there. The parties nevertheless respectively sought to gain something, and we must determine whether their actions, though not qualifying as a contract, constituted a transaction subject to safe harbor review.

¶15 Courts addressing the conflict of interest provisions of the RMBCA have looked to Black's Law Dictionary and the Official Comments for assistance in defining "transaction." *See Mueller v. Zimmer*, 124 P.3d 340, 357-58 (Wyo. 2005); *Glad Tidings Assembly of God v. Neb. Dist. Council of the Assemblies of God, Inc.*, 734 N.W.2d 731, 737-38 (Neb. 2007). Black's Law Dictionary defines transaction as:

> 1. The act or an instance of conducting business or other dealings; esp., the formation, performance, or discharge of a contract. 2. *Something performed or carried out; a business agreement or exchange.* 3. *Any activity involving two or more persons.* 4. *Civil law.* An agreement that is intended by the parties to prevent or end a dispute and in which they make reciprocal concessions.

*Black's Law Dictionary* 1635 (Bryan A. Garner ed., 9th ed., Thomson Reuters 2009) (last emphasis in original). The Official Comments to Subchapter F state:

> [T]he subchapter is applicable only when there is a "transaction" by or with the corporation. For purposes of subchapter F, "transaction" generally connotes negotiations or a consensual bilateral arrangement between the corporation and another party or parties that concern their respective and differing economic rights or interests—not simply a unilateral action by the corporation but rather a "deal."

2 *MBCA Annotated*, Introductory Comments to Subchapter F, at 8-373 (Supp. 1997). These sources indicate that, though not limited to contracts, transactions involve the conducting of business by more than one party—an "activity involving two or more persons," "negotiations," "a deal," or "a consensual bilateral arrangement" respecting "differing economic rights or interests."

¶16    In its factual explanation of the case, the Tenth Circuit Court indicates that the purpose of the bonus was to compensate Robert for past service to the company and to prevent him from resigning.  More specifically, as found in the District Court's order, which was provided to this Court and referenced by the Tenth Circuit Court in its order, Robert was promised implementation of an incentive program which would have provided him the opportunity to receive additional compensation, and he accepted a below-market salary based on that promised incentive program.  Although Robert's bonus was neither awarded pursuant to an employment contract nor subject to any conditions for its receipt, the District Court found that "[t]he bonus was intended to reward R. Gately for past services performed in the ordinary course of his employment as Company President, to compensate him for the Board's failure to implement the promised incentive package by bringing his salary for the past five years up to market level, and to keep him from resigning as President."  The District Court found that "R. Gately would have left the Company if he had not received the bonus," but concluded "[t]he fact that R. Gately stayed on as President, in the absence of an employment contract, does not provide consideration for the bonus."  The District Court also found that the bonus, as constituted, was the result of negotiations between Stephanie and Robert.

¶17    We conclude that the circumstances here constitute a "transaction" subject to safe harbor review.  Even without regard to past compensation, Campbell sought Robert's continued service and Robert stayed on as President because of the bonus he received.

While this may not have constituted consideration for a contract to pay the bonus, it was, at the least, a "consensual bilateral arrangement" involving "differing economic rights or interests," or a "business exchange" or "negotiation" that can be reviewed under the safe harbor provision.

¶18 Our conclusion that the safe harbor provision applies here is supported by the Official Comments, which describe director compensation as a conflicting interest issue which can be reviewed for fairness to the corporation:

> Directors' fees and similar forms of compensation . . . in the normal course of business are typically set by the board and are specially authorized (though not regulated) by sections 8.11 and 8.57 of the Model Act. These practices obviously involve a conflicting interest on the part of most if not all of the directors and are capable of being abused, although, in the usual case, they fall within normative patterns and fairness can be readily established. While, as a matter of practical necessity, these practices are universally accepted in principle by the law, *board action on directors' compensation and benefits would be subject to judicial sanction if not in the circumstances fair to the corporation or favorably acted upon by shareholders pursuant to section 8.63.*

2 *MBCA Annotated*, Official Comments to § 8.61(b), at 8-403 (Supp. 1997) (emphasis added).

¶19 Our answer to the first certified question is yes—the subject bonus can be reviewed under the safe harbor provision.

¶20 ***(2) Does the business judgment rule apply to situations involving a director's conflict-of-interest transaction?***

¶21 The MBCA codifies the standards of conduct for directors of a corporation. "A director shall discharge his duties as a director, including the director's duties as a member of a committee: (a) in good faith; (b) with the care an ordinarily prudent person

13

in a similar position would exercise under similar circumstances; and (c) in a manner the director reasonably believes to be in the best interests of the corporation." Section 35-1-418(1), MCA (2003); *see also* § 35-1-443(1), MCA (applying the duty of care to officers). Generally, as long as officers and directors satisfy these standards, they will not be held liable for errors in judgment. *See Knutson*, ¶ 34 (citation omitted).

¶22 Although codifying the duty of care, the drafters of the RMBCA deliberately chose not to codify the business judgment rule. Sensitive to the variations in application of the rule across jurisdictions, they "specifically resisted the temptation to codify the elusive and related business judgment rule because courts need the flexibility provided by the business judgment rule in applying the duty of care to directors." Steven C. Bahls, *Montana's New Business Corporation Act: Duties, Dissension, Derivative Actions and Dissolution*, 53 Mont. L. Rev. 3, 9 (1992). This Court has explained that the business judgment rule "'immunizes management from liability in a corporate transaction undertaken within both the power of the corporation and the authority of management where there is a reasonable basis to indicate that the transaction was made in good faith. . . . It is too well settled to admit of controversy that ordinarily neither the directors nor the other officers of a corporation are liable for mere mistake or errors of judgment, either of law or fact.'" *Ski Roundtop, Inc. v. Hall*, 202 Mont. 260, 273, 658 P.2d 1071, 1078 (1983) (internal quotation marks omitted) (quoting *Nursing Home Bldg. Corp. v. DeHart*, 535 P.2d 137, 143-44 (Wash. App. Div. One 1975), and W. Fletcher, *Private Corporations* § 1039, at 621-25 (perm. ed. 1974)).

¶23 Citing *Ski Roundtop*, the District Court reasoned that "[t]o the extent S. Gately and R. Gately acted as directors, their actions are also measured by the 'business judgment rule.'" Applying the rule, the District Court determined that "Plaintiffs failed to offer proof that Defendants' actions were unreasonable in that they would not have been taken by 'an ordinarily prudent man … in the management of his own affairs of like magnitude and importance,'" quoting *Alaska Plastics, Inc. v. Coppock*, 621 P.2d 270, 278 (Alaska 1980) (internal quotation marks omitted). It concluded that Defendants "acted prudently to keep a valuable employee who was being underpaid and in accordance with the business judgment rule." However, in a footnote, the District Court noted the issue that has now been certified to this Court:

> Plaintiffs argue that the business judgment rule does not apply in conflicted interest transactions and cite three cases from other jurisdictions for this principle. The parties did not cite, and the Court did not locate, any Montana cases addressing this issue. The Court need not try to determine how Montana would rule on this question, however, because the facts satisfy both the more liberal business judgment rule and the more exacting fairness standards.

In their arguments to this Court, Plaintiffs maintain their position that the business judgment rule only applies to defend claims asserting a violation of the duty of care, not to claims asserting a violation of the duty of loyalty, such as the conflict of interest situation involved here. Defendants, in their briefing to this Court, argued that the business judgment rule could apply as a defense to breach of loyalty claims and that it should merge into the "fairness test" of the safe harbor analysis for conflict of interest situations. However, at oral argument, Defendants appeared to alter or clarify their

15

position, arguing that the business judgment rule is not considered when resolving a conflict of interest claim—addressed by the safe harbor provision—but only in resolving a claimed breach of the duty of care.

¶24    Therefore, we have determined, for purposes of answering the certified question, to concur with the parties and conclude that the business judgment rule does not apply to challenges based upon a director's conflict of interest, a position commonly expressed by commentators. *See* Jennifer Berger, Carol Jones, & Britta Larsen, *Fletcher Cyclopedia of the Law of Private Corporations*, vol. 3A, § 1040, 50-53 (Perm. ed. West 2002) (footnotes omitted) ("To gain the protection of the business judgment rule, a director must have been disinterested, independent, and informed.  A director is interested where the director has a financial or pecuniary interest in a transaction other than that which devolves to the corporation or to all of the shareholders generally.  Accordingly, where the director appears on both sides of a transaction the rule will not protect the decision or the director making it. . . .   The business judgment rule does not protect corporate fiduciaries who engage in self-dealing or make decisions affected by inherent conflict of interest."); *see also* Oitzinger, 58 Mont. L. Rev. at 432-33 (footnotes omitted) ("Most analysts describe these duties in terms of a duty of care to which the business judgment rule applies, and a duty of loyalty or fair dealing to which the business judgment rule does not apply. . . .   The distinction between breaches of the duty of care on one hand and breaches of the duty not to self-deal or otherwise deal unfairly on the other has been said to be 'fundamental to . . . the preservation of state corporate law.'").

16

¶25    Our answer to the second certified question is no.[3,4]

¶26    *(3)  Does the holding in Daniels, [246 Mont. at 136-39], 804 P.2d at 365-67, which appears to adopt an alternative test for evaluating whether there has been a breach of fiduciary duties by a controlling shareholder in a closely-held corporation, apply to a transaction that involves a conflict of interest?*

¶27    "'[A] close corporation is one in which management and ownership are substantially identical to the extent that it is unrealistic to believe that the judgment of the directors will be independent of that of the stockholders.'" *Skierka v. Skierka Bros., Inc.*, 192 Mont. 505, 519, 629 P.2d 214, 221 (1981) (internal quotation marks omitted) (quoting *Thisted v. Tower Mgt. Corp.*, 147 Mont 1, 14, 409 P.2d 813, 820 (1966)).  The

---

[3] We decline to consider whether the District Court erred by relying on *Ski Roundtop*, a pre-MBCA case, to reach the opposite conclusion.  Although not addressing the conflict of interest issue in *Ski Roundtop*, we applied the business judgment rule to the entire board of directors, including a director who had an apparent conflict of interest.  *Ski Roundtop*, 202 Mont. at 274, 658 P.2d at 1078-79.  Application of the MBCA to the situation in *Ski Roundtop* would require a different analysis.  *See* Oitzinger, 58 Mont. L. Rev. at 450.

[4] The bonus here was not ratified by a vote of disinterested directors pursuant to § 35-1-462(2)(a) and 35-1-463, MCA.  Therefore, we do not address whether a conflicted transaction, which has been ratified by a majority of *disinterested* directors, could still be challenged as a breach of the duty of care and defended by the business judgment rule.  *See* 2 *MBCA Annotated*, Official Comments to § 8.61(b), at 8-400 through -401 (Supp. 1997) ("Clause (1) of subsection (b) provides that if a director has a conflicting interest respecting a transaction, neither the transaction nor the director is legally vulnerable if the procedures of section 8.62 [§ 35-1-463, MCA] have been properly followed.  Subsection (b)(1) is, however, subject to a critically important predicate condition.  The condition—an obvious one—is that the board's action must comply with the care, best interests and good faith criteria prescribed in section 8.30(a) for all directors' actions.  If the directors who voted for the conflicting interest transaction were qualified directors under subchapter F, but approved the transaction merely as an accommodation to the director with the conflicting interest, going through the motions of board action without complying with the requirements of section 8.30(a), the action of the board would not be given effect for purposes of section 8.61(b)(1) [§ 35-1-462(2)(a), MCA]. . . .  If a determination is made that the terms of a director's conflicting interest transaction, judged according to the circumstances at the time of commitment, were manifestly unfavorable to the corporation, that determination would be relevant to an allegation that the directors' action was not taken in good faith and therefore did not comply with section 8.30(a).").

17

fiduciary duty between shareholders of a close corporation is one of the "'utmost good faith and loyalty.'" *Daniels*, 246 Mont. at 137, 804 P.2d at 366. This duty of good faith runs between all shareholders, applying to both majority and minority shareholders. *Sletteland v. Roberts*, 2000 MT 382, ¶ 30, 304 Mont. 21, 16 P.3d 1062; *Whitehorn v. Whitehorn Farms, Inc.*, 2008 MT 361, ¶ 34, 346 Mont. 394, 195 P.3d 836. Such shareholders "'may not act out of avarice, expediency or self-interest in derogation of their duty of loyalty to the other stockholders and to the corporation.'" *Daniels*, 246 Mont. at 137, 804 P.2d at 366 (quoting *Donahue v. Rodd Electrotype Co. of New England, Inc.*, 328 N.E.2d 505, 515 (Mass. 1975) (emphasis omitted).

¶28 The certified question inquires about application of the *Daniels* test. Daniels was a branch manager and shareholder of T D & H, and owned stock in a related corporation, T & D Properties. *Daniels*, 246 Mont. at 128-29, 804 P.2d at 361. Thomas was the president, director, and major shareholder of both corporations. *Daniels*, 246 Mont. at 129, 804 P.2d at 361. Daniels intended to retire, and an agreement was drafted to terminate Daniels' employment and purchase Daniels' minority stock interest in T & D Properties. *Daniels*, 246 Mont. at 129-30, 804 P.2d at 361-62. However, a dispute arose, and Daniels sued Thomas and both corporations for, inter alia, breach of fiduciary duty. *Daniels*, 246 Mont. at 130, 804 P.2d at 362. The District Court held that Thomas had breached his fiduciary duty to Daniels. *Daniels*, 246 Mont. at 135, 804 P.2d at 365.

¶29 We reversed that holding, and in so doing modified the duty which shareholders owe to each other in a closely-held corporation, in reliance upon *Wilkes v. Springside*

18

*Nursing Home, Inc.*, 353 N.E.2d 657 (Mass. 1976). *Daniels*, 246 Mont. at 137-38, 804 P.2d at 366. We noted *Wilkes'* statement that "the controlling group in a close corporation have certain rights to what has been termed 'selfish ownership' in the corporation which need to be balanced against their fiduciary obligation to minority stockholders," and quoted *Wilkes*:

> "It must be asked whether the controlling group can demonstrate a legitimate business purpose for its action. . . . In asking this question, we acknowledge the fact that the controlling group in a close corporation must have some room to maneuver in establishing the business policy of the corporation. . . . If called on to settle a dispute, our courts must weigh the legitimate business purpose, if any, against the practicability of a less harmful alternative." (Citations omitted.)

*Daniels*, 246 Mont. at 137, 804 P.2d at 366 (quoting *Wilkes*, 353 N.E.2d at 663). We clarified that, while the fiduciary duty among close corporation shareholders is one of utmost good faith and loyalty, "the controlling group should not be stymied by a minority stockholder's grievances if the controlling group can demonstrate a legitimate business purpose and the minority stockholder cannot demonstrate a less harmful alternative." *Daniels*, 246 Mont. at 137-38, 804 P.2d at 366.

¶30    Although the certified question asks whether *Daniels* should be applied to "a controlling shareholder," the matter is complicated by the fact that Stephanie wore two hats, acting both as controlling shareholder and as director, and that the claims against her are based on her actions in both capacities. First, Plaintiffs claimed that Stephanie acted with a conflict of interest as both director and shareholder, alleging that "[t]he bonus scheme proposed by S. Gately is a conflict of interest transaction which, under Montana

19

law, cannot be ratified or approved by her *either as a director or by voting shares she owns or controls* in favor of shareholders' ratification." (Emphasis added.) Nonetheless, while the claim references Stephanie's role as shareholder, it necessarily challenges her role as a director in a conflict of interest transaction. As we explained above, a director conflict of interest transaction is now clearly governed by §§ 35-1-461 through -464, MCA; *see* 2 *MBCA Annotated*, Official Comments to § 8.60, at 8-383 (Supp. 1997) ("The limited thrust of the subchapter is to establish procedures which, if followed, immunize a corporate transaction and the interested director against the common law doctrine of voidability grounded on the director's conflicting interest."); *see also* 2 *MBCA Annotated*, Introductory Comments to Subchapter F, at 8-373 (Supp. 1997) ("The focus of subchapter F is sharply defined and limited. . . . [T]he subchapter is targeted on legal challenges based on interest conflicts only."). Because this claim challenges Stephanie's role in a director's conflict of interest transaction, this claim is reviewed and resolved only by these statutory provisions. The *Daniels* test does not apply.

¶31 However, Plaintiffs also asserted a claim of breach of fiduciary duties against Stephanie, which was not limited to her involvement in a conflict of interest transaction. They alleged: "As a director and shareholder of the Company, S. Gately owes the Company and her fellow shareholders fiduciary duties of obedience, diligence and loyalty. Those duties include obligations of good faith, fair dealing, due care, oversight and supervision, and to refrain from self-dealing. . . . The Gatelys each violated the foregoing fiduciary duties by knowingly using their powers and control to cause the

20

Company to award illegal, unfair and grossly excessive compensation to R. Gately. Their actions were not a good faith exercise of business judgment designed to protect and promote the best interests of the Company and its shareholders."[5] This claim is separate from and broader in scope than the alleged conflict of interest violation. As is evident from a review of the Act, this claim falls outside the provisions of subchapter F of the RMBCA governing director conflict of interest transactions.

¶32   Regarding the scope of the Act, the Comments explain that "the narrow scope of subchapter F must again be strongly emphasized; if the transaction is vulnerable to attack on some other ground, subchapter F does not make it less so for having been passed through the procedures of subchapter F." 2 *MBCA Annotated*, Official Comments to § 8.61, at 8-398 (Supp. 1997). Similarly,

> Subchapter F does not undertake to define, regulate, or provide any form of procedure regarding other possible claims. *For example, subchapter F does not address a claim that a controlling shareholder has violated a duty owed to the corporation or minority shareholders.*

2 *MBCA Annotated*, Introductory Comments to Subchapter F, at 8-373 (Supp. 1997) (emphasis added); *see also* 2 *MBCA Annotated*, Official Comments to § 8.61, at 8-398 (Supp. 1997) ("If the attack is on other grounds [than a director's conflicting interest], subchapter F has no relevance to the issue(s) before the court."). In an example provided by the Comments where *X* Co. is the majority shareholder of *Y* Co. and votes its qualified shares under 8.63 [§ 35-1-464, MCA], "the vote under section 8.63 [§ 35-1-464, MCA]

---

[5] We note that Plaintiffs' complaint alleged a breach of fiduciary duties against Robert as well, in his roles as director and officer. The certified question does not address these claims, and we likewise do not reach them.

21

has no effect whatever of exonerating or protecting *X* Co. if *X* Co. fails to meet any legal obligation that, as the majority shareholder of *Y* Co., it may owe to the minority shareholders of *Y* Co." *See* 2 *MBCA Annotated*, Official Comments to § 8.63(b), at 8-494 (Supp. 1997).

¶33   Although Plaintiffs' claim of breach of fiduciary duties against Stephanie as majority shareholder makes reference to "self-dealing," and certainly encompasses facts regarding her conflict of interest, the claim broadly alleges that Stephanie, as majority shareholder, failed to exercise good faith, business judgment, due care, oversight and supervision, and thus breached her duties to the minority shareholders.  This is a claim which is beyond the scope of the statutory safe harbor provisions.  As explained in the Comments to the RMBCA, even if the transaction is approved as a director's conflict of interest transaction, it still could be challenged as a breach of duties to the minority shareholders.  *See* 2 *MBCA Annotated*, Introductory Comments to Subchapter F, at 8-373 (Supp. 1997) ("subchapter F does not address a claim that a controlling shareholder has violated a duty owed to the corporation or minority shareholders").  Thus, this claim is governed by Montana common law.

¶34   As discussed above, *Daniels* governs the fiduciary duties owed among shareholders in a closely-held corporation.  *Daniels* did not directly address a conflict of interest.  Thomas had offered to step aside and let another person handle the negotiations with Daniels, and we noted that any potential conflict of interest in the matter had therefore been eliminated.  *Daniels*, 246 Mont. at 139, 804 P.2d at 367.  However, our

reasoning in *Daniels* implicitly recognized that the *Wilkes* balancing test would be applied in the context of conflicted interest situations involving shareholders in a close corporation. *See Daniels*, 246 Mont. at 137, 804 P.2d at 366; *see also Solomon v. Atlantis Development, Inc.*, 516 A.2d 132, 136 (Vt. 1986) (additional citation omitted) (a shareholder "is not automatically disqualified from voting on matters affecting his self-interest . . . . [T]he duty of loyalty and good faith is fulfilled if the controlling group [or interested stockholder] can 'demonstrate a legitimate business purpose for its action,'" citing *Wilkes*).[6]

¶35    Thus, the *Daniels* test is applicable to such claims of breach of fiduciary duty. To be clear, however, *Daniels* is not a mechanism by which an otherwise improper transaction can be validated. The purpose of the *Daniels* test is to assess the actions of the majority shareholders in fulfilling fiduciary duties to the minority shareholders.[7]

---

[6] We cited the *Daniels* test in *Whitehorn*, which involved a claim that majority shareholders had breached their fiduciary duties to a minority shareholder. *Whitehorn*, ¶¶ 33, 36. However, a specific conflict of interest analysis was not undertaken in that case.

[7] *Daniels* also discussed the law allowing minority shareholder claims for illegal, oppressive, or fraudulent acts of the corporation. *Daniels*, 246 Mont. at 139, 804 P.2d at 367 (citing § 35-1-921, MCA (1989), now codified in § 35-1-938(2)(b), MCA (2011); additional citations omitted). The Court observed that such claims must be analyzed on a case-by-case basis. *Daniels*, 246 Mont. at 140, 804 P.2d at 368 (citations omitted). Alleged breach of fiduciary duty is just one part of that analysis. We have identified "three definitions or approaches for analyzing oppression: whether there has been 'harsh, dishonest or wrongful conduct and a visible departure from the standards of fair dealing which inure to the benefit of [the] majority and to the detriment of the minority;' an analysis of 'the "fiduciary duty" of good faith and fair dealing owed by majority shareholders to the minority;' and an assessment of 'the reasonable expectations of the minority shareholders in light of the particular circumstances of each case.'" *Whitehorn*, ¶ 26 (quoting *Fox v. 7L Bar Ranch Co.*, 198 Mont. 201, 209-10, 645 P.2d 929, 933 (1982)).

¶36    In summary, we conclude that the *Daniels* test does <u>not</u> apply to the claim challenging Stephanie's role in the director conflict of interest transaction.  That claim is governed by the safe harbor procedures of §§ 35-1-461 through -464, MCA.  However, the claim of breach of fiduciary duties alleged by the minority shareholders against Stephanie in her capacity as majority shareholder is governed by Montana common law, and the *Daniels* test applies.

/S/ JIM RICE


We concur:


/S/ MIKE McGRATH
/S/ PATRICIA COTTER
/S/ JAMES C. NELSON
/S/ BETH BAKER
/S/ MICHAEL E WHEAT
/S/ BRIAN MORRIS